# REPORTS OF CASES

DETERMINED IN

# THE SUPREME COURT,

## APRIL TERM, 1861.

TESCHEMACHER *et al.*, EXECUTORS, *v.* THOMPSON *et al.*

WHERE a patent of land was issued by the United States to executors, and an executrix of the last will and testament of one H. in trust for the heirs and devisees of the said H., and the executrix subsequently intermarried with one of the executors : *Held*, that under the statute of this State the authority of the executrix ceased by her marriage, and that ejectment based upon the patent was properly brought in the name of the executors.

By the designation "usual" or "ordinary high water mark," as applied to tide waters, is meant the limit reached by the neap tides—that is, those tides which happen between the full and change of the moon twice in every twenty-four hours.

By the law of nations, independent of treaty stipulations, the cession of territory from one government to another does not impair the rights of the inhabitants to their property. They retain all such rights, and are entitled to protection in them to the same extent as under the former government. Public property and the sovereignty over the territory are only considered as passing by the cession.

When, therefore, California was ceded to the United States, the rights of property of its citizens remained unchanged. By the law of nations, those rights were sacred and inviolable, and the obligation passed to the new government to protect and maintain them. The obligation was political in its character, binding upon the conscience of the new government, and to be executed by proper legislative action, when the requisite protection could not be afforded by the ordinary course of judicial proceedings in the established tribunals, or

by existing legislation; and independent of the obligation arising from the law of nations, the United States, by the treaty of Guadalupe Hidalgo, in effect stipulated for the protection of the rights of. property of the inhabitants of the ceded territory.

The term property as applied to lands, embraces all titles, legal or equitable, perfect or imperfect.

Assuming that the Mexican grant, upon which the patent of the plaintiffs in this case was issued, conveyed only an interest requiring further action of the government, and that such action was not had previous to the cession; in other words, that it conferred a merely equitable title, which was never perfected under the former government; the title still constituted property, and as such the government of the United States was under obligation to protect it by the law of nations and by the stipulations of the treaty. This protection it could extend in its own way. To protect an equitable title is to perfect it, or to afford the means of its perfection. By the Act of March 3d, 1851, the government has afforded such means. It has there provided for protecting all titles, legal or equitable, acquired previous to the cession.

Its power to thus provide results from the fact that it is sovereign and supreme as to all matters connected with the treaty, and the enforcement of the obligations incurred thereunder, or cast upon it, independent of the treaty, by the law of nations upon the cession of the country. It must determine for itself what claims to property existed at that date, which it is bound to protect, and the lands to which they apply, and the parties by whom they were then held.

Subsequent claimants take in strict subordination to the action of the government, and they are not entitled to any notice of its proceedings. Whatever interests they may possess were acquired with full knowledge of the treaty, and of the obligations and powers of the new government.

The patent is not only the deed of the United States, but it is a solemn record of the government, of its action and judgment with respect to the title of the claimant existing at the date of the cession. By it the sovereign power, which alone could determine the matter, declares that the previous grant was genuine; that the claim under it was valid, and entitled to recognition and confirmation by the law of nations and the stipulations of the treaty; and that the grant was located or might have been located by the former government, and is correctly located by the new government, so as to embrace the premises as they are surveyed and described. Whilst this declaration remains of record, the government itself cannot question its verity, nor can parties claiming through the government by title subsequent.

The patent, as the deed of the United States, takes effect only from the date of the presentation of the petition of the patentees to the Board of Land Commissioners. But as the record of the government of the existence and validity of the grant, it establishes the title of the patentees from the date of the grant—such title depending, up to the issuance of the patent, upon the character of the grant and the proceedings of the former government in reference to it; whether it were of a specific tract separated from other lands by defined boundaries, or were only of a specific quantity lying within an area of

Teschemacher *v.* Thompson.

larger extent; and in the latter case, whether or not the quantity had been located by official authority.

Assuming that the grant upon which the patent to the plaintiffs was issued was one of quantity only, requiring at the cession the action of the government to give it location, the duty devolved upon the new government to make the location. This was essential to perfect the equitable title of the grantees. The duty of the government attaching at the date of the cession, its performance could not be interfered with or defeated by any matters subsequently occurring. The patent, therefore, to the plaintiffs, considered as issued upon a grant of that character, is evidence that the grantees possessed at the date of the cession a vested interest in the quantity of land mentioned in the grant—a right to so much land to be afterwards laid off by official authority; that the premises in controversy were then subject to appropriation in satisfaction of the quantity granted; and that the government of the United States, in discharge of its duty, has, through its appropriate departments, made the appropriation, and thereby given precision to the title of the grantees and attached it to the tract as surveyed.

The "third persons" against whose interests the action of the government and patent in this case are not conclusive—under the fifteenth section of the Act of March 3d, 1851,—are those whose title accrued before the duty of the government and its rights under the treaty attached.

In the present case the United States, upon the cession of the country, took the premises in controversy charged with the equitable claim of the Mexican grantees, and have since perfected the claim into a perfect title. But for such equitable claim the United States would have held the title in trust for the new State, but the claim existing, the State and all other parties hold in subordination to the action of the government respecting it. The right and power of the government to protect and thus perfect the equitable claim were superior to any subsequently acquired rights or claims of the State or of individuals. Subsequent events, not originating with the grantees, can have no effect upon the validity of their claim, or the duty of the government respecting it.

The cases of *Pollard's Lessee* v. *Hagan,* (3 How. 212) and *Goodtitle* v. *Kibbe,* (9 How. 471) commented upon, and distinguished from the case at bar.

APPEAL from the Twelfth District.

This is an action of ejectment to recover a tract of land situated in San Mateo county. On the trial it was admitted that the patent of the United States embraced that part of the demanded premises which was in the possession of the defendants, as stated by them in their amended answer. All other material facts of the case are stated in the opinion of the Court. The defendants had judgment and plaintiffs appeal.

*Sidney L. Johnson,* for Appellants.

I. The patent of the United States could not be impeached

collaterally by the defendants. They do not connect themselves in any manner with the title which they allege to be outstanding in the State of California. They are mere intruders, and the patent and the survey it embraces are conclusive evidence against them. (*Moore* v. *Wilkinson*, 13 Cal. 478; *Yount* v. *Howell*, 14 Id. 465; *Stark* v. *Barrett*, 15 Id. 362; *Doll* v. *Meador*, 16 Id. 296; *Ely* v. *Frisbie* 17 Id. 250.)

No attempt is made by the counsel for the defendants to question the correctness of these decisions; his endeavor is to show that this case is not within their purview. The case of *Doll* v. *Meador*, he says, is the principal one, but that there the defendants' claim of title was from the same source as that of plaintiffs'; whereas, in this case, the defendants seek to avail themselves of a title springing from a different source than that of the appellants.

But the doctrine in that case in no manner depends upon the source of the supposed outstanding title. The offer of the assailants in that case and in the one at bar is to prove a *superior* outstanding title; in the former case, by showing that the title had never passed from the United States to the State whose patent was relied on; in the latter, by showing that the title had passed from the United States, whose patent was relied on, before the patent was issued. The one offer was as good as the other, as exclusive under the one patent as under the other.

In *Doll* v. *Meador* the absence of all privity between the defendants and the title set up as paramount, the absence of any action on the part of the government, in which the paramount title was asserted to be, questioning or authorizing any one to question the validity of the patent, are among the grounds assigned for holding it conclusive. Those reasons can be given with at least equal force in the case before the Court. The question is not one of estoppel founded on some privity of the parties with a common source of title, but one of the effect of record evidence, complete and unquestioned in itself, upon an attempt to attack it collaterally, made by one who neither sets up nor shows any privity with our own, or with the alleged paramount title.

In *Doll* v. *Meador* it was said of the State patent that: "It is

Teschemacher *v.* Thompson.

the record of the State that the land was subject to location under the grant of the United States, and has been located through her officers in pursuance of the terms of the donation, and as against parties who have no higher right than that which arises from mere occupation, it imports absolute verity." With the like reason and truth may it be said that our patent is the record of the United States, that the land in question was granted to us by the government of Mexico, and that it has been correctly surveyed and located by the officers of the United States in pursuance of the terms of the grant to us, and that, as against the defendants, who have no higher right than that which arises from mere occupation, it imports absolute verity.

II.  The amended answer of the defendants shows that they are unlawfully in possession of said land, both as to the State of California and as to plaintiffs, their defense amounting to the averment of a purpresture as to the former, and of a private nuisance as to the latter, which were unlawful acts and could not be pleaded.

The patent of the United States shows the premises to be land granted to us by Mexico, confirmed and adjudged to us by a tribunal appointed by law to be sole judge of the question, measured off and set apart to us by the proper department of the government as the identical land so granted and confirmed to us, fronting on the bay and on the creek of San Mateo. The defendants call upon you to go behind this patent. You have said that the law does not allow these solemn records to be impeached by proof of facts, dehors the record, at the suggestion of mere intruders. Still less can it be done by intruders who plead their own wrong.

III.  The verdict of the jury was clearly against the evidence. The jury were evidently mistaken in the meaning of the language used in the instruction : " *usual* high water mark."

*W. T. Gough,* for Respondents.

The defense in this case is that the land in controversy belongs to the State of California, and that the origin of the title of the State thereto is different from that of appellants. Two preliminary questions arise :

1st. Can such a defense against appellants' patent be set up in

any case ?    2d. If so, can the respondents avail themselves thereof without showing a connection with such title ?

The answer to the first question is found in the fifteenth section of the Act of Congress of March 3d, 1851, entitled "An Act to ascertain and settle the Private Land Claims in the State of California," providing that patents issued under the provisions of that act shall not affect the rights of third parties.    Such patents are conclusive only on the patentees, and the United States and all claiming under the United States, which does not meet the proposition, as we do not claim by title under the United States.    The owner of the title under which we claim is a third party.

On the second proposition there seems to be some controversy. It is strenuously contended by appellants that in no case can a defendant avail himself of an outstanding superior title, unless he shows himself in privity with that title, or at least holding under some color from it.    Several cases are cited in support of this position, but the case of *Doll* v. *Meador* (16 Cal. 296) is especially relied upon.    The doctrine of that case upon this point we think the counsel of the appellants has totally mistaken.    The defendants there undertook to show title in the United States to the lands in controversy, although not connected therewith, against a patent from the State for lands donated to her by the United States. This court decided it could not be done, because the United States and the State, as to such lands, stood in the relation of donor and donee, as to the grant ; and principal and agent, as to the selection of the lands ; and such being the case, a mere possessor, without any other title, was estopped from making a defense to the patent which the donor and principal had refused to make.    If the donor and principal refused or neglected to make such opposition and permitted the donee and agent to make such selection, no third party not connected with either had the right to complain.    There was no adverse outstanding title in the United States to such lands. Here we contend title in the State is adverse and outstanding.

The defendant may bar the plaintiff's recovery by showing a clear subsisting title in a stranger.    (*Hall* v. *Gittings*, 2 Harr. & J. 112 : *Colman* v. *Talbot*, 2 Bibb, 129.)

And so by showing an elder outstanding patent for the land.

(*Colston* v. *Mc Vay*, 1 A. K. Marsh, 250 ; *Thomas* v. *Head*, Id. 450 ; *Voorhees* v. *Bridgford*, 3 Id. 26 ; *Price* v. *Evans*, 4 B. Monroe, 386 ; *Gurno* v. *Jones*, 6 Miss. 330 ; *Peck* v. *Carmichael*, 9 Yerg. 325 ; *Love* v. *Gates*, 4 Dev. & Batt. 363 ; *Connolly* v. *Doe*, 8 Black, 320 ; *Wolfe* v. *Dowele*, 13 S. & M. 103.)

In the latter case, the defendant was permitted to set up an outstanding title in a stranger as a first defense, although he claimed also from the same source as the plaintiff.

The doctrine of the above cases is sustained in this State in the cases cited below.

Again, the above authorities are conclusive upon the point that, if the outstanding title is from a common origin, yet the defendant, although unconnected with it, may set it up if it is then in a stranger.

There is, however, a well defined exception to this general doctrine, which, perhaps, is applicable in both cases—that is, in case of a mere intruder or trespasser. He cannot protect himself by setting up an outstanding title in a stranger. (*Jackson* v. *Harder*, 4 Johns. 202.)

In *Welch* v. *Sullivan*, (8 Cal. 511) the Court says that the plaintiff never was in the actual possession, and defendant was ; then plaintiff can only recover upon his strict legal title, and defendant, although not connected with the outstanding title, can still show where the true title is, plaintiff's title being not simply *prima facie* but conclusive, if it exists at all.

In *Bird* v. *Lisbros*, (9 Cal. 1) the same doctrine is held, in the following language :

" But when the plaintiff in ejectment does not rely on prior possession, but on his strict title, the defendant in possession, having a good *prima facie* right, may set up and show the true title to be in another party. By showing this fact, he proves that the plaintiff has no title with which to overcome that which the law presumes to exist in the defendant by virtue of his actual possession."

We are neither intruders nor trespassers. We are in actual possession—having, in virtue thereof, a good *prima facie* right ; and appellants rely solely on their strict paper title. We never actually ousted or interfered with appellants' actual possession. We

then set up title in the State of California, and show such to be the case by proving the premises in controversy to be below the ordinary high tide water mark of the bay of San Francisco at the date of the admission of the State into the Union, or rather between the ordinary ebb and flow of the tide at that time. The jury, under the charge of the Court, having found such to be the fact, the question then is, to whom do such lands belong? We maintain, to the State of California, and never were granted to the appellants or their grantor; and that the United States could give no title thereto, neither by a patent confirming a grant, nor in any other way. In this controversy we entirely reject and do not claim under the swamp and overflowed land acts. The Act of Congress of twenty-eighth of September, A. D. 1850, granting the swamp lands, etc., in Arkansas to that State, relates simply to fresh water overflows, for there is no ebb and flow of the tide in that State; and the act of the third day of March, A. D. 1857, simply extends the benefits of the Act of twenty-eighth of September, 1850, to the other States—in other words, granting them all the swamp and overflowed land within their borders overflowed by fresh water.

When the revolution took place, the people of each State became sovereign, and in that character hold the absolute right to the navigable waters and the soils under them for their own common use, subject only to the rights by them since surrendered by the Constitution to the General Government. (*Martin* v. *Waddell*, 16 Pet. 369.)

Has the fee in such soil ever passed to the General Government? The shores of navigable waters and the soils under them were not granted by the Constitution to the United States, but were reserved to the States respectively, and the new States have the same rights over the subject as the original States. (*Pollard's Lessee* v. *Hagan*, 3 How. 212.)

This is the controlling authority on this subject, and the facts in that case and this are precisely similar. There, as here, the plaintiff claimed under a patent from the United States, and defendants setting up title in the State at the date of her admission into the Union, without showing any connection with that title. The prayer, also, in this case, asked for by the respondents and given by the

Court, was taken *verbatim* from the charge of the Court in *Pollard's Lessee* v. *Hagan*.

·The case does not stand alone, but has since been approved of in several decisions.    (See *Goodtitle* v. *Kibbe*, 9 How. 477, and *Doe* v. *Beebe*, 13 How. 25.)

California came into the Union on equal footing with the other States.

It has been suggested that there may be a distinction between the cases in Howard's Reports and this, since the grants in those cases were confirmed by Congress direct, and here by the Land Commission and the United States Courts.    We can see no force in the distinction : the Land Commission was not solely a judicial body, but in fact acted under Congress, with partly political as well as judicial powers.    But were it otherwise, it would make no difference, since no Court can conclude the right of a party not before it.    The State, as we claim, is a third party, within the meaning of the Act of Congress before cited.

Again, it is contended that Mexico, by the grant upon which the patent of the appellants is founded, ceded this land to the appellants' grantor.    But even if we concede that she did, it is earnestly insisted that since the admission of this State into the Confederacy, the grant is void to the extent of these lands, and under our form of government can never be perfected by a patent.    If the doctrine of the above cases is correct, what matters it if even the Mexican Government granted the whole bay of San Francisco to the appellants ?

Could any treaty which the United States might make with Mexico, guaranteeing property to Mexican citizens in the territory ceded to the United States by such treaty, protect such an individual right, which would interfere with the whole form of our Confederacy ?    Take away from one State a right and sovereignty which another·State enjoys ?    We think not.    We give the answer to the proposition in the clear and concise language of the Supreme Court of the United States :

" It cannot be admitted that the King of Spain could by treaty or otherwise impart to the United States any of his royal prerogatives, and much less can it be admitted that they have the capacity·

to receive or power to exercise them.    Every nation acquiring ter-
ritory by treaty or otherwise must hold it subject to the Constitu-
tion and laws of its own Government, and not according to those of
the Government ceding it."

FIELD, C. J. delivered the opinion of the Court—COPE, J. con-
curring.

This is an action of ejectment to recover the possession of cer-
tain premises situated in San Mateo county, being part of a tract
known as the " San Mateo Rancho."    The plaintiffs are the exec-
utors of the last will and testament of W. D. M. Howard, deceased,
and base their claim to a recovery upon a patent of the rancho,
issued to them as such executors, and Agnes Howard, executrix, by
the United States, bearing date in November, 1857.    The patent
is based upon a grant of the former Mexican Government, in which
one of the boundaries of the rancho is designated as the bay of San
Francisco, and it conveys the premises in controversy in fee, in the
usual form of patents, to the executors and executrix, in trust for
the heirs and devisees of the said Howard.    Since the issuance of
the patent, the executrix has intermarried with one of the plaintiffs,
and by the marriage, her authority as such executrix ceased.    (See
Act concerning Estates of Deceased Persons, sec. 44.)    The
action therefore is properly brought in the name of the plaintiffs.
(Curtis v. Sutter, 15 Cal. 259.)

The record does not contain a copy of the Mexican grant, or of
the patent of the United States, but we infer from the argument of
counsel that the grant was one in colonization and in the ordinary
form—subject to the approval of the Departmental Assembly, and
requiring juridical possession from the magistrate of the vicinage ;
and that the patent of the United States was issued under the Act
of March 3d, 1851, after the usual proceedings before the Land
Commission, and the tribunals of the United States, and the official
survey of the premises.    It is upon this view we have considered
the questions argued by counsel.

The defendants, in their answer as amended, admitted that they
were in possession of a part of the demanded premises, and set up
in bar of the action, title in the State of California, alleging, in sub-

Teschemacher v. Thompson.

stance, that the land thus possessed by them was below the ordinary high tide water mark of the bay of San Francisco at the time of the admission of the State into the Union, and has been thus situated ever since, with the exception of that portion occupied by their buildings, which they allege has since been reclaimed from the waters of the bay by them, or by parties through whom they claim. On the trial they introduced evidence, against the objection of the plaintiffs, in support of the allegations of the answer, and the Court instructed the jury that if the premises were below the usual high water mark at the time the State was admitted into the Union, the Act of Congress and the patent gave the plaintiffs no title, whether the water had receded by the labor of man only, or by alluvion. The jury found for the defendants, and it is from the judgment entered upon their verdict, and from the order refusing the motion made for a new trial, that the appeal is taken.

We are satisfied that the verdict is not justified by the evidence. No instructions were given as to the meaning of the language, "usual high water mark," and the jury evidently fixed it at the limit which the monthly Spring tides reach—tides which occur only at the full and change of the moon. The term "usual," employed by the Court, is ambiguous. The limit of the monthly Spring tides is, in one sense, the usual high water mark; for, as often as those tides occur, to that limit the flow extends. But it is not the limit to which we refer when we speak of "usual" or "ordinary" high water mark. By that designation we mean the limit reached by the neap tides; that is, those tides which happen between the full and change of the moon, twice in every twenty-four hours. Yet the jury, from want of proper instruction, must have taken a different view, and considered the language as referring to the limit which the monthly Spring tides attained, or else have acted, in rendering their verdict, in mere caprice, as there was no evidence before them, so far as the record discloses, that the neap tides ever covered the land in controversy. (Lord Hale's Treatise De Jure Maris, 26 ; *Lowe* v. *Govett*, 3 Barn. & Adol. 862 ; Angell on Tide Waters, Ch. 3 ; Hale on Rights to the Sea.)

We do not intend, however, to determine the appeal in this way. We prefer to place our decision upon grounds which will finally dis-

pose of the controversy between the present parties, and furnish a rule for the settlement of other controversies of a similar character. For that purpose, we shall assume that the land occupied by the defendants, and constituting a part of the demanded premises, was, at the date of the admission of California as a State into the Union, below the ordinary high water mark of the bay of San Francisco ; in other words, was covered by the flow of the ordinary or neap tides of the bay. Upon that assumption, the land thus occupied belonged at that date to the State, unless it had been the subject of a previous grant by the Mexican Government, which the United States, upon the acquisition of the country, were bound to protect, and which they have since recognized and confirmed. Until the acquisition of the country, the land was of course under the jurisdiction, control and disposition of the former Government, and the rights acquired by the United States were in subordination to the action of that Government, so far as such action was entitled to consideration either from the law of nations or the stipulations of the treaty of cession. In that respect the land under the tide waters of the bay between low and high water mark stood in no different position from that of any other land over which the former Government possessed the power of disposition.

By the law of nations, independent of treaty stipulations, the cession of territory from one Government to another does not impair the rights of the inhabitants to their property. They retain all such rights, and are entitled to protection in them to the same extent as under the former Government. Public property and the sovereignty over the territory are only considered as passing by the cession. Thus in *United States* v. *Percheman*, (7 Pet. 86) the Supreme Court said : " Had Florida changed its sovereignty by an act containing no stipulation respecting the property of individuals, the right of property in all those who became subjects or citizens of the new Government would have been unaffected by the change. It would have remained the same as under the ancient sovereign. * * * A cession of territory is never understood to be a cession of the property belonging to its inhabitants. The King cedes that only which belonged to him. Lands he has granted were not his to cede. Neither party could so understand the

cession ; neither party could consider itself as attempting a wrong to individuals, condemned by the practice of the whole civilized world.   The cession of a territory by its name from one sovereign to another, conveying the compound idea of surrendering at the same time the lands and the people who inhabit them, would be necessarily understood *to pass the sovereignty only, and not to interfere with private property.*"   And again in *Strother* v. *Lucas*, (12 Pet. 435) which was an action of ejectment for certain real estate in Missouri, the same Court said : " The State in which the premises are situated was formerly a part of the territory, first of France, next of Spain, then of France, who ceded it to the United States by the treaty of 1803, in full propriety, sovereignty and dominion, as she had acquired and held it, (2 Pet. 301, etc.) by which the Government put itself in place of the former sovereigns, and became invested with all their rights, subject to their concomitant obligations to the inhabitants.   (4 Pet. 513 ; 9 Id. 734 ; 10 Id. 330, 335, 726, 732, 736.)   Both were regulated by the law of nations, according to which the rights of property are protected, even in the case of a conquered country, and held sacred and inviolable when it is ceded by treaty, with or without any stipulation to such effect. — "   When, therefore, California was ceded to the United States, the rights of property of its citizens remained unchanged.   By the law of nations those rights, in the language of the Supreme Court, were "sacred and inviolable," and the obligation passed to the new Government to protect and maintain them. The obligation was political in its character, binding upon the conscience of the new Government, and to be executed by proper legislative action when the requisite protection could not be afforded by the ordinary course of judicial proceedings in the established tribunals, or by existing legislation.

But independent of the obligations arising from the law of nations, the United States, by the treaty of Guadalupe Hidalgo, in effect stipulated for the protection of the rights of property of the inhabitants of the ceded territory.   By the eighth article they provided that Mexicans established in the territory might remain there or remove to the Mexican Republic, and retain their property, or dispose of the same and remove the proceeds.   This pro-

vision for the retention of the property was an idle and deceptive one, if it did not carry with it a corresponding obligation of the new Government to protect the property thus retained. Such obligation it did in fact imply, and this obligation was as sacred and binding as if it were stated in express terms.

The term property as applied to lands, embraces all titles, legal or equitable, perfect or imperfect. Such was held by the Supreme Court to be the import of the term in a stipulation contained in the treaty by which Louisiana was acquired, providing that the inhabitants of the ceded territory should be protected in their property. It " comprehends," said the Court, in *Soulard* v. *The United States*, " every species of title, inchoate or complete. It is supposed to embrace those rights which are executory, as well as those which are executed. In this respect the relation of the inhabitants to their Government is not changed. The new Government takes the place of that which has passed away." (4 Peters, 511.) And the same Court, in a subsequent case, after referring to the same stipulation in the Louisiana treaty, observed that, " No principle is better settled in this country than that an inchoate title to lands is property." (*Delassus* v. *The United States*, 9 Peters, 133.) It matters not, therefore, whether the Mexican grant, upon which the patent of the plaintiffs was issued, passed a perfect title to the premises, or only an interest which required further action of the Government for its perfection. We are not informed by the record whether it was of a specific tract with defined boundaries, or was only of a specific quantity lying in a area of larger extent. We shall assume for the purposes of the present appeal that it was of the latter character, and conveyed only an interest requiring further action of the Government, and that such action was not had previous to the cession—in other words, that it conferred a merely equitable title, which was never perfected under the former Government. The title still constituted property within the decisions of the Supreme Court, which we have cited, and as such the Government of the United States was under obligation to protect it by the law of nations and by the stipulations of the treaty. This protection it could extend in its own way. But to protect an equitable title is to perfect it, or to afford the means of its perfection. By

Teschemacher v. Thompson.

the Act of March 3d, 1851, the Government has afforded such means. It has there provided for protecting all titles, legal or equitable, acquired previous to the cession. Its power to thus provide cannot be questioned. The power results from the fact that it is sovereign and supreme as to all matters connected with the treaty, and the enforcement of the obligations incurred thereunder, or cast upon it, independent of the treaty, by the law of nations upon the cession of the country. It must determine for itself what claims to property existed at that date, which it is bound to protect, and consequently the lands to which they apply, and the parties by whom they were then held. In protecting those claims it must necessarily make them good as against others asserting interests from events subsequently transpiring, otherwise its power to carry out the stipulations of the treaty and the obligations imposed by the law of nations would be limited and dependent, and not sovereign and supreme. Subsequent claimants must therefore take in strict subordination to its action. And such subsequent claimants are not entitled to any notice of its proceedings. The sovereign power can, as we have already observed, afford the requisite protection in its own way; it can do so by a direct legislative Act perfecting at once the equitable title, or by authorizing proceedings to be taken before its tribunals and officers; and it is under no more obligation to give notice to parties asserting subsequently acquired interests in the one case than in the other. Nor can subsequent claimants have any just grounds of complaint, for whatever interest they may possess were acquired with full knowledge of the treaty, and of the obligations and powers of the new Government.

By the Act of March 3d, 1851, the Government has established a tribunal for the investigation of the validity of the titles asserted to have existed previous to the cession; required evidence to be presented respecting the same; designated law officers to appear and litigate the matter on behalf of the United States; authorized appeals, first to the District and then to the Supreme Court; and appointed surveyors to survey and measure off the land, when once the title has been recognized and confirmed. By the various proceedings required, numerous securities are afforded against imposition and fraud. As the last act in the series of proceedings, a

patent is to issue to the claimant. This instrument is not only the deed of the United States, but it is a solemn record of the Government, of its action and judgment with respect to the title of the claimant existing at the date of the cession. By it the sovereign power, which alone could determine the matter, declares that the previous grant was genuine; that the claim under it was valid and entitled to recognition and confirmation by the law of nations and the stipulations of the treaty; and that the grant was located, or might have been located by the former Government, and is correctly located by the new Government so as to embrace the premises as they are surveyed and described. Whilst this declaration remains of record, the Government itself cannot question its verity, nor can parties claiming through the Government by title subsequent.

The patent, it is true, as the deed of the United States, takes effect only from the date of the presentation of the petition of the patentees to the Board of Land Commissioners. (*Moore* v. *Wilkinsos*, 13 Cal. 485; *Yount* v. *Howell*, 14 Id. 469; *Stark* v. *Barrett*, 15 Id. 386; and *Ely* v. *Frisbie*, 17. Id. 250.) But as the record of the Government of the existence and validity of the grant, it establishes the title of the patentees from the date of the grant —such title depending, up to the issuance of the patent, upon the character of the grant and the proceedings of the former Government in reference to it; whether it were of a specific tract separated ·from other lands by defined boundaries, or were only of a specific quantity lying within an area of larger extent; and in the latter case, whether or not the quantity had been located by official authority. (*Stark* v. *Barrett*.) The grant upon which the patent to the plaintiff was issued is not set forth, as we have stated, in the record, and we are left in ignorance whether it is of a specific tract or only of a·specific quantity. If it be of the former character, it passed to the grantees, upon its issuance, a present and immediate interest in the premises. If it be of the latter character, it passed a like interest in the specific quantity designated, to be afterwards located within the general tract by the authority of the Government. If such location were made under the former Government, the interest of the grantees became thereby, from its date, attached

Teschemacher *v.* Thompson.

to the particular tract assigned to them.    But if no such proceeding were had under the former Government, the right to determine the location passed upon the cession of the country, with all other public rights, to the United States.    The interest therefore held under the grant, at the date of the cession, must have been either in a specific tract, made so by the terms of the grant itself, or by subsequent location under the former Government, or in a specific quantity to be laid off by the new government.    We have assumed that the grant was one of quantity only, requiring at the time the action of the Government to give it location, as this view is the one most favorable to the defendants.    Such being the case, the duty devolved upon the new Government to make the location.    This was essential to perfect the equitable title of the grantees, and thus give it the protection for which the Government in effect stipulated by the treaty, and which it was bound to give independent of the treaty, by the law of nations.    The duty of the Government attaching at the date of the cession, its performance could not be interfered with or defeated by any matters subsequently occurring. The patent, therefore, to the plaintiffs, considered as issued upon a grant of the character which we have assumed it to be, is evidence that the grantees possessed at the date of the cession a vested interest in the quantity of land mentioned in the grant—a right to so much land to be afterwards laid off by official authority ; that the premises in controversy were then subject to appropriation in satisfaction of the quantity granted ; and that the Government of the United States, in discharge of its duty, has, through its appropriate departments, made the appropriation, and thereby given precision to the title of the grantees and attached it to the tract as surveyed.    The " third persons " against whose interest the action of the Government and patent are not conclusive—under the fifteenth section of the Act of March 3d, 1851—are those whose title accrued before the duty of the Government and its rights under the treaty attached.

The views we have thus expressed dispose of the present appeal. The United States, upon the cession of the country, took the premises charged with the equitable claim of the Mexican grantees, and have since perfected the claim into a perfect title.    But for such.

equitable claim the United States would have held the title in trust for the new State, but, the claim existing, the State and all other parties must hold in subordination to the action of the Government respecting it. The right and power of the Government to protect and thus perfect the equitable claim were superior, as we have shown, to any subsequently acquired rights or claims of the State or of individuals. Immediately upon the cession of the country, the Government could have complied with its obligations, and at once have perfected the claim. Subsequent events not originating with the grantees can have no effect upon the validity of their claim, or the duty of the Government respecting it.

There is nothing in the decisions of the Supreme Court of the United States in *Pollard's Lessee* v. *Hagan* (3 How. 212) and *Goodtitle* v. *Kibbe*, (9 Id. 471) which in any respect militates against these views. The first case was an action of ejectment to recover certain premises situated in the city of Mobile, State of Alabama, constituting part of the shore of a navigable tide water river, lying below high water mark, when the State was admitted into the Union in 1819. The plaintiffs relied upon an act of Congress, passed subsequently to the admission of the State—in July, 1836, and a patent of the United States issued in pursuance thereof. It was held that the State, upon her admission into the Union, became entitled to the soil under the navigable waters within her limits not previously granted, and that the act of Congress and patent were in consequence inoperative to pass any title to the patentees. There was no pretense in the case, as it was presented to the Court, that the patentees had acquired any rights to the demanded premises previous to the admission of Alabama, which the United States were under any obligations, from the law of nations, treaty stipulations or otherwise, to protect. The question as to the right of soil was presented unembarrassed by any proceedings had respecting the same by any authority existing previous to the admission of the State. The second case was also an action of ejectment for premises similarly situated, and the plaintiffs claimed under the same act of Congress and patent, and also an inchoate Spanish grant dated in December, 1809, but the Court affirmed the previous decision in *Pollard's Lessee* v. *Hagan,* and observed as to

Teschemacher *v.* Thompson.

the Spanish grant, that it had been repeatedly decided that such grant in that territory, whether inchoate or complete, made after the treaty of St. Ildefonso, in 1800, did not convey any right in the soil to the grantee, referring particularly to a recent decision on that point in the *United States* v. *Reynes* (9 How. 127). In that case, thus referred to, it was held that the treaty of Ildefonso deprived Spain of the power to make grants of land in Louisiana, if not after its date, certainly after the twenty-first of March, 1801, and that the stipulation in the treaty of Paris, by which Louisiana was acquired, to protect the inhabitants in the enjoyment of their property, had no application to a grant of land made by the Spanish authorities subsequent to that period, and that such grant was void. And hence the Court very properly remarked, in *Goodtitle* v. *Kibbe*, that the existence of the imperfect and inoperative Spanish grant, which the plaintiffs in that case produced, could not enlarge the power of the United States over the place in question, after Alabama became a State, nor authorize the General Government to grant or confirm a title to land, when the sovereignty and dominion over it had become vested in the State—in other words, that the existence of a previous void grant did not enlarge the power of the General Government over the premises, and its confirmation by that Government, subsequent to the admission of Alabama, did not impair her rights. The distinction between that case and the one at bar is too obvious to require comment. If the Spanish grant gave any equities to the grantee, as Congress by its legislation appeared to consider it did, as stated in the opinion of the Supreme Court in the case of *Pollard's Lessee* v. *Files* (2 How. 594)—a case which arose upon the same grant, act of Congress and patent mentioned in *Goodtitle* v. *Kibbe*—the equities were only considerations addressed to the beneficence of the Government—reasons for the bestowal of its bounty, and were not founded on claims which the Government was under obligation, by treaty stipulations or otherwise, to protect. The claim of the grantees under the grant upon which the patent to the plaintiffs in the case at bar was issued, was not upon the beneficence of the Government, but upon its sense of justice. The grantees did not ask of the Government to confer rights of property, but to respect and settle those already con-

ferred.    There is no resemblance in the position of the grantees in the two cases.

Judgment reversed, and cause remanded for a new trial.