## Case No. 16,030.

### UNITED STATES v. PERALTA et al.

[Hoff. Dec. 212; Cal. Law J. & Lit. Rev. 41.]

District Court, N. D. California.   Oct. 1, 1862.

MEXICAN LAND GRANTS—DECREE OF CONFIRMATION—AFFIRMANCE BY SUPREME COURT—OBJECTIONS TO SURVEY—AUTHORITY OF DISTRICT COURT.

[Where the supreme court, in affirming a decree of confirmation by the district court, delivers an opinion clearly showing that the land intended to be confirmed is that described in the title papers, but it is not clear from the decree of the district court that the boundaries fixed are the same as those described in the title papers, the latter court may, under the act of 1860, upon objections to the official survey, inquire, not merely whether the boundaries described therein are in accordance with the terms of its own decree, but whether they are in accordance with the title papers upon which the judgments of both courts were founded.]

[Claim of Domingo and Vicente Peralta for San Antonio in Alameda county. Claim filed January 21, 1852, confirmed by the commission February 7, 1854, by the district court January 26, 1855, and by the United States supreme court in 19 How. (60 U. S.) 343.]

HOFFMAN, District Judge. This cause comes up on objections filed to the official survey on the part of the United States and of certain parties who have intervened for their interests. The principal point in controversy is the location of the northern boundary or dividing line between the rancho of the Peraltas and that of Castro. The official survey has been made in conformity with an amended decree of this court. This amendment was allowed by the court on the supposition that the error to be corrected was merely clerical, and that the decree, as amended, expressed the intention of the court when the original decree was framed. The cause having been originally tried in this court by the late judge of the Southern district, I was, at the time of allowing the amendment, unacquainted with the merits, and assumed, perhaps too hastily, that the alleged error was merely accidental. It is now objected that the court had no power to make the amendment, and that, the decree having been affirmed in the supreme court, it is res adjudicata, and the law of the case, whatever be its correctness. I shall consider the question thus raised precisely as if no amendment had been made, and shall inquire whether, by the just construction and legal effect of the decree of the supreme court affirming that of the district court, I am precluded from examining into the true location of the northern boundary in question, and establishing the same as the proofs taken in this proceeding under the act of 1860 [12 Stat. 22], shall require.

It is not pretended that this court has any power to reverse or annul its own final decrees for errors of fact or law after the term at which they were rendered, unless for clerical mistakes, or that any change or modification can be made which will vary or affect it in any material thing. Ex parte Sibbald, 12 Pet. [37 U. S.] 491; [Cameron v. M'Roberts] 3 Wheat. [16 U. S.] 591; [Bank of Kentucky v. Wistar] 3 Pet. [28 U. S.] 431. Still less has it any such power over the final decrees of the supreme court,—its duty being to execute the mandate,—and this though it should be discovered that neither it nor the supreme court had jurisdiction over the cause. [Skillern v. May] 6 Cranch [10 U. S.] 267; [Washington Bridge Co. v. Stewart] 3 How. [44 U. S.] 424; Id. 611. It is urged, however, that the proceedings in the cause, and the opinion of the supreme court, when considered in connection with the mandate, show that it was not the intention of the supreme court to determine the question now raised with respect to the location of the northern boundary; and further, it is contended that, by the act of 1860, all questions of location and boundary are referred to this court to be determined in a new proceeding between new parties and on additional evidence.

To arrive at a just appreciation of the true construction and effect of the decree and mandate of the supreme court, a brief review of the proceedings in the cause and the questions presented for decision is necessary. The claimants derived title under an order made by Governor Sola, in August, 1820, directing Luis Peralta to be put in possession of a tract of land extending from the creek of San Leandro to a small hill adjoining the sea beach, at the distance of four or five leagues. This was accordingly done, and the return of the officer, Martinez, describing the boundaries of the tract of which he gave possession,

is produced. On the thirtieth of August of the same year, the governor, on the reclamation of the Mission of San Francisco, directed a portion of the lands assigned to Peralta to be withdrawn, and on the sixteenth of September, Martinez established new boundaries for the grantee, fixing them at a rivulet which runs down from the mountains to the beach where there is a grove of willows, and about a league and a half from the cerrito of San Antonio, in the direction of San Leandro (i. e. to the south). On the thirtieth of August, 1823, Governor Arguello made a decree, directing that "the land which, by the order of his predecessor, had been taken from Peralta after it had been granted to him and possession had been given, should be returned to him," and on the fourth of December, 1824. Martinez returns that in compliance with the order "the land which had been taken from Peralta has been returned to him, and he has been put in possession of the place called 'Cerritos de San Antonio,' and the rivulet which crosses the place to the coast, where is a rock looking to the north." On the eleventh of February, 1844, Ignacio Peralta, one of the heirs of Luis Peralta, petitioned the governor for a new title to the land, in consequence of the original title papers having been lost. This petition was accompanied by a diseño, or map. On the thirteenth of February, 1844, Jimeno reports that by the documents which Don Ignacio Peralta presents he shows that there was granted to his father the tract of land called "San Antonio," agreeably to the extent shown by the map which he presents, and that, as it is twenty-two years since the government of that period made the grant and ordered possession to be given, the interested parties having occupied the land since the year 1819, he believes there is no objection whatever to granting him a new title. On the same day the governor, Micheltorena, ordered the title to be issued. The usual decree of concession was accordingly drawn up. It declares Peralta owner in fee of the land bounded "on the southeast by the creek of San Leandro, on the northwest by the creek of the Cerritos de San Antonio, on the southwest by the sea, and on the northeast by the top of the range of hills." This document contains an order that "this expediente be transmitted to the departmental assembly for their approval," but nothing further appears to have been done, no formal title seems to have been issued, nor is the decree of concession signed by Micheltorena. On these documents it was contended before the board that: 1st. The officers were without power to make the grant, and 2d, that the northern boundary should be fixed at the creek of San Antonio, being the reduced limits fixed by Martinez when Peralta was deprived of a part of his land on the reclamation of the mission. A majority of the board confirmed the claim within these limits.

A dissenting opinion, however, was delivered by Mr. Commissioner Thompson, in which the right of the claimant was maintained to the whole tract originally assigned and subsequently returned to him by order of Arguello, and the boundaries of which are described in the report of Martinez, and in the decree of concession by Micheltorena, and delineated on the map which accompanied Peralta's petition to the latter. In this opinion the location of the northern boundary is discussed; and the attempt made to identify the rivulet issuing from the "mountain range and running along the foot of the cerrito of San Antonio, where, at the entrance of a little gulch there is a rock elevating itself in the form of a monument, looking towards the north," as described by Martinez, with the San Antonio creek, is pronounced incompatible with the proofs. which unmistakably establish the identity of the two cerritos of the brook which runs at the base of the larger one, and the rock at the entrance of the little cañada. The testimony of Berreyesa, who states that the southern and not the northern base of the cerrito of San Antonio was established by Martinez as a boundary, is referred to as constituting the only discrepancy in the evidence, and his statement is rejected "as directly in conflict with the return of the officer who gave the possession, and the other testimony which established the rivulet running at the base of the mountain as the boundary." The cause having been appealed to the district court by the claimants, it was again urged by the United States that the grant was invalid, and that the claim should be rejected in toto. But the court affirmed the validity of the claim presented in the petition to the whole extent of its bounds. In the decree the northern boundary is described as follows: "A line commencing on the Bay of San Francisco, at a point where there are close to the bay the two cerritos as described in the first possession given by Martinez to Luis Peralta on the 16th August, 1820, running from the said bay eastwardly along by the southern base of the cerrito of San Antonio up a ravine, at the head of which is a large rock, or monument. looking to the north, described in the evidence as the 'Sugar Loaf Rock'; thence by the southern base of said rock to the comb or crest of the Coast Range of Mountains." It does not appear for what reason the court thus described the northern boundary, nor is it easy, without doing some violence to the terms of the description, to adopt the Codornices creek as the boundary. The line is directed to be run from the bay "eastwardly along by the southern base of the cerrito of San Antonio, up a ravine, at the head of which there is a large rock, described in the evidence as 'Sugar Loaf Rock,'" etc. But we have seen that the boundary which, according to Martinez' report, divided and separated the land, was a "rivulet," and not a "ravine;" nor is any ravine found near either the northern base or the southern base of the cerrito, until the whole width of the plain is crossed, and the base of the mountains reached. If,

then, the Codornices be taken to be the boundary intended, we must attribute to the court a singular inaccuracy of language, and this when the report of Martinez, which was evidently intended to be adopted, pointedly distinguishes between the arroyito or rivulet designated as a boundary, and the cañadita or little gulch, at the mouth or entrance of which was the penasco, or monumental rock.

Again, the decree speaks of a ravine, "at the head of which is a large rock, described in the evidence as the 'Sugar Loaf Rock,'" etc. But the sugar loaf rock described in the evidence at that time before the court was the remarkable rock near the Cerritos creek; and this is situated not at the head but "at the entrance of a ravine," and that ravine, or rather the brook which issues from it, is at the northern, and not the southern, base of the cerrito. If, then, we consider that the rock referred to in the decree is the same as that mentioned by Martinez in his report, and which had, up to that time. been alone spoken of by the witnesses, it would be impossible to adopt the Codornices as a boundary, for the rock is not near that creek, and no attempt had then, or has since been, made to show that at the mouth of the gulch from which it issues, any rock exists at all corresponding with the description given by Martinez. On the appeal from this decree, taken by the United States, it was again urged—1st, that the whole claim was invalid; and 2d, that the land did not extend beyond San Antonio creek. To these points the attention of the supreme court was exclusively directed. No question seems to have been raised as to whether the brook mentioned by Martinez as flowing at the case of the cerrito of San Antonio flowed at its northern or southern base. The identity of the two cerritos being satisfactorily established, the attention of the court was not called to the fact that there might still be room for controversy as to the particular rivulet mentioned by Martinez. The decree of the district court was, therefore, affirmed.

But the opinion of the court discloses that in settling the northern boundary the supreme court intended to adopt precisely the line described by Martinez in his first report; again, in his redelivery of possession under Arguello's order, and again in the title of confirmation given by Micheltorena. All these documents are expressly referred to by the supreme court, and the description of the line given by Martinez in his first report is even copied into the opinion totidem verbis. Indeed, any other interpretation of their decree would be absurd; for, the validity of the grant by Sola, and the subsequent restoration of the land by Arguello, being recognized, the only tract to which that grant could have referred was the tract of which the possession had been given by

Martinez, and which is described in his report. If, then, on further examination, it appears that the land described in the decree affirmed by the supreme court is not the same as that whereof possession was given by Martinez, it has appeared to me to be the duty of this court, under the act of 1860, to conform to the obvious intention of the supreme court, rather than to the mere letter of its mandate, and to cause to be surveyed to the claimants the tract of which Martinez gave possession, and which he describes in his report.

I therefore think myself at liberty to inquire, not merely whether the official survey is in accordance with the terms of the decree of this court, affirmed by the supreme court, but whether it is in accordance with the possession given by Martinez, upon which the judgments of both courts were founded. Had the two reports of Martinez, the concession by Micheltorena, and the diseño presented by Peralta, been expressly referred to in the final decree for a further description of the land, there would then (if the decree describes a different tract from that described in those documents) have been such a repugnance on the face of the decree as would clearly have authorized the location of the land as required by the title papers, rather than by the description in the decree. But the opinion of the supreme court shows as clearly as if it had been so stated in the decree that the land intended to be confirmed was that described in the title papers; and the decree of the district court is affirmed and adopted, because it was supposed to describe the same land, no suggestion to the contrary appearing to have been made or considered. It is to be observed, in addition, that the objection to the official survey is made on the part of persons claiming title under Castro, the grantee of the rancho to the north of that of the Peraltas. That rancho is bounded on the south by the rancho of San Antonio. But even if, by reason of the point having become res adjudicata, the northern boundary of San Antonio should be fixed at the creek to the south of the cerrito, it would not follow that the same line would form the southern boundary of the Castro rancho. As between the owners of the latter rancho and the United States, it would still be open to show what were the true boundaries of the San Antonio; and, if the northern boundary of the latter should be found to be the northern base of the cerrito, that boundary would be the southern limit of the Castro rancho. Moreover, the decree in the Castro case, as well as the title papers, call for the "Cerrito de San Antonio" as its southern boundary. If, then, by reason of the acquiescence of the Peraltas in the decree of the district court, which fixed their boundary at a brook about half a mile south of

·the cerrito, they should be restricted to that line. the only effect would be to leave between the two ranchos a strip of vacant land. which the United States do not claim should be reserved. Unless, therefore, the line described in the decree in the case at bar should be found to be the true line of division between the ranchos, and such as the court would adopt in the Castro case, were that now under consideration, I am unable to perceive how the parties intervening in this cause can be· benefited by a decision adopting the line contended for by them, not because it is the true line, but because the decree adopting it has become final.

I proceed to consider the question of location on its merits. The identity of the cerrito of San Antonio is not disputed. It is claimed that the rivulet mentioned by Martinez is the Codornices creek. This creek rises in the mountains, and flows in a nearly westerly direction toward the bay, not far from parallel with the Cerritos creek, and at the distance from it of about a mile, to the south. But this creek in several respects fails to answer the description given by Martinez. The creek described by him flowed at the base of the larger cerrito. The Codornices does not run into the bay, although its channel from the hills and to a considerable distance across the plain is clearly marked. But shortly after crossing the main road which traverses the plain from south to north, its channel disappears, and though, perhaps, as testified by the witnesses, its course at very high water may be traced by a superficial deposit of gravel, etc., there is nothing which could be called a channel, or which in ordinary seasons would reveal the existence of a brook or the bed of a brook. It is contended that its waters have been in some degree diverted by a small ditch recently dug; but this suggestion seems conclusively met by the diseño presented by Peralta to Micheltorena in 1844. On this diseño a creek is delineated running from the mountains, and sinking a short distance to the west of the road, precisely as it is represented . on the recent and accurate topographical map of Stratton. The Codornices, moreover, if continued to the bay in the same direction, would pass by the cerrito at the distance of more than a quarter of a mile from its southern base, and when we remember that the possession of Martinez was given on the 16th of August, in the middle of the dry season, it is almost impossible to suppose that he could have intended to describe that brook as a "stream flowing at the base of the cerrito." On ascending the Codornices, we find no rock situated "at the entrance, or mouth of the little gulch." The high conical rock which it has been sought to identify with that spoken of by Martinez, is situated far up on

the mountain. It is at a considerable distance to the north of the main branch of the creek, and to an observer approaching it from the west or southwest it seems to be nearly on the crest of the ridge. But by no one could it be described as "situated in the mouth of a little gulch, or cañadita." But the diseño of Peralta decisively settles any doubt which might be felt as to the creek referred to by Martinez. This diseño was drawn to indicate to Micheltorena the tract which had been granted to the father of the petitioner, and for which he asked a new title. With this diseño before him, and perhaps after referring to the Castro expediente, which was then in the archives, Jimeno reports: "By the documents which Don Ignacio Peralta presents, he accredits that to his father was granted a tract of land called 'San Antonio,' agreeably to the extent shown by the diseño which he presents." On this diseño the cerrito of San Antonio is plainly delineated, and to the north of it, flowing from the hills into an estero of the bay, is a creek, on the north side of which is written "Terreno de los Castros," and on the south "Terreno de los Peraltas," thus "dividing and separating the land." That this creek is the Cerritos creek, cannot be doubted. Its course and position with respect to the cerrito, exactly correspond, and it falls into an estero which puts up from the bay at right angles to the shore, or towards the east. At the point where the creek issues from the mountains, is a small triangular object, which seems almost certainly to have been intended to represent the rock spoken of by Martinez, and in fact there is found at the entrance of the little gulch in the hills from which the creek issues, and in a position corresponding to that of the object on the diseño, a very remarkable rock, of which photographic drawings have been exhibited, and which is identified by some of the witnesses who assisted at the act of possession, as the rock referred to by Martinez.

At the request of all the parties, and accompanied by their counsel, I have visited the rancho, in order to learn by personal observation the actual features of the country. I confess myself unable to see how any one with the diseño before him, could for a moment doubt what creek was there intended to be delineated as the northern boundary of the tract. Much testimony has been taken to show that the Cerritos creek did not, until recently, extend to the estero by any clearly defined channel. That on the present road, which runs much nearer the bay than that used by the old inhabitants of the country, the creek may be crossed in the dry season without attracting notice, is quite possible. But my own observation has shown me, and the photograph (Exhibit Watkins, No. 8) proves, that to one standing on the hills, its course is distinctly marked across the whole

plain, and nearly, if not quite, to the point where it runs into the marsh and estero. The diseño, however, removes all doubt on the subject, for it demonstrates that whether or not its channel was discernible in 1850 and 1851, when the witnesses testify to crossing it with hay-wagons, etc., it was in 1844 known to flow in a well-defined channel from the mountains to the marsh and estero at the northern base of the cerrito. In fact, if it be once admitted that the diseño represents the land granted by Sola, and of which possession was given by Martinez, I cannot perceive how the location of the boundaries can be open to controversy. That the diseño does represent that tract is expressly stated by Jimeno, and the well-known carefulness and circumspection of that officer give to his statements great weight. The tract delineated on the diseño exactly corresponds with the description given by Martinez. We have the larger cerrito at a short distance from the beach, the creek flowing along its base, and the high rock at the entrance of the cañadita from which it issues. That Micheltorena intended to grant, or rather issue, a new title for the land delineated on the diseño, cannot be doubted. In his decree of concession, the creek of Los Cerritos de San Antonio is expressly mentioned as the northwestern boundary, and this decree, called by the supreme court the title of confirmation by Micheltorena, is referred to in its opinion as clearly describing the same monuments as those mentioned by Martinez. It is therefore clear that this claim must be considered precisely as if the diseño of 1844 had been attached to the report of Martinez, or the grant by Sola. And, if so, the location of the boundaries is unmistakable. A corroboration of these views is found in the expediente and diseño of Castro. By the grant to Castro, his rancho is bounded by the cerrito of San Antonio, and the same boundary is designated in the decree of confirmation, which has been acquiesced in by the parties. This description of itself, would, if the ordinary rule be applied, exclude the object named as the boundary. But the diseño removes all doubt. On it a conical hill is represented, and inscribed "Cerrito de San Antonio," while from its summit, or northeastern side, it is not easy to say which, a dotted line is projected, evidently intended to indicate the boundary. This line, though not extended to the hills, nevertheless shows that the boundary ran to the northeast, and that it did not commence at the southern base of the cerrito, and run towards the hills in a direction south of east.

If, however, the limits of the Castro rancho be fixed as is now contended for, at the Codornices creek, it will include not only all the cerrito, but a tract nearly a quarter of a mile wide to the south of it, and will embrace lands not even represented on the Castro diseño. Much testimony has been taken to show that Castro has occupied the tract in question with his cattle and cultivated fields, and that the Peraltas have at various times acknowledged the Codornices to be the boundary. But evidence as to oral admissions of this nature is at all times unreliable, especially when it is, as in this case, conflicting. That in 1844, Peralta claimed to the creek called "Cerritos," is clear from the diseño, and we learn by the report of Jimeno that his father had occupied the land agreeably to the extent shown by the diseño since 1819. One of the Peraltas testifies that Castro was the first squatter he ever had on his land, and it is clear that in 1830, when the diseño of Castro was drawn for him by Forbes, and in 1834 when Joaquin Isidro Castro presented it to the governor, the tract in dispute could not have been occupied or claimed by Castro, for it was not even represented on his diseño. That in times comparatively recent, the Castros had a cultivated field to the south of the Cerritos creek, seems to be established, but I see nothing in that fact or the other evidence showing Castro's occupation of the disputed tract, sufficient to justify us in disregarding the boundaries so unmistakably indicated by the report of Martinez, the diseño, and concession in the expediente of 1844, and the natural objects found upon the ground. For these reasons I am of the opinion that the location of the northern boundary is correctly located in the official survey, and that the objections to it should be overruled.

The official survey is also objected to on the ground that it embraces lands on the shores of the bay below the ordinary high-water mark. These lands have been treated as having passed to the state of California as incidental to her sovereignty on her admission to the Union, and they have been disposed of by the state as her own. I do not understand it to be denied that the call in the grant for the bay as a boundary bounds it by the shores of the bay, nor is it contended in this case that that term should not be construed to embrace only what at common law is considered to be the shores of the sea. It includes all lands below ordinary high-water mark; that is, the limits reached by those tides which happen between the full and change of the moon, twice in the twenty-four hours. Teschemacher v. Thompson, 18 Cal. 21; Ang. Tide Waters, c. 3, and cases cited.

It seems, from the deposition of Stratton, that the official survey embraces lands below ordinary high-water mark, and in this respect it is evidently erroneous. I think that the western boundary should therefore be modified so as to exclude those lands lying below that limit, whether they be situated on the bay itself, or on the shores of any navigable estuary that may extend from the bay into the interior.