## COBURN v. SAN MATEO COUNTY.

(Circuit Court, N. D. California. July 14, 1896.)

No. 12,030.

1. CALIFORNIA TIDE LANDS—TITLE OF STATE—MEXICAN GRANTS.

In California, the title to tide lands between high and low water mark is in the state, except in cases where grants may have been made by the Mexican government before the territory was acquired by the United States, expressly covering tide lands; in which event the United States, under the treaty of Guadalupe Hidalgo, would be bound to protect all private rights to such lands as against the state.

2. BOUNDARIES—LANDS BORDERING ON SEA—TIDE LANDS.

A grant by the Mexican government in California of land bordering "to the west on the sea" included only the lands above high-water mark, and did not cover the tide lands. A boundary on the "sea" means the same thing as on the "seashore." More v. Massini, 37 Cal. 432; U. S. v. Pacheco, 2 Wall. 587, followed.

3. SAME—GOVERNMENT SURVEYS—MEANDER LINES.

The meander lines run by the United States surveyors along the margin of the sea in surveying a Mexican grant, like meander lines upon navigable waters generally, are for the purpose of defining the sinuosities of the bank and determining the quantity of land in the grant, and not for the purpose of limiting the boundary, the latter being defined in all cases by the waters themselves. Railroad Co. v. Schurmeir, 7 Wall. 272, and Hardin v. Jordan, 11 Sup. Ct. 808, 838, 140 U. S. 371, followed.

4. TIDE LANDS—GRANT BY STATE TO COUNTY—CONSTITUTIONAL LAW.

The California act of February 27, 1893, declaring all the tide lands between high and low water mark, at the place known as "Pebble Beach," in San Mateo county, to be public grounds, and granting the same to said county, in trust for the use of the public, is constitutional and valid. The words "Pebble Beach," in this grant, were used merely as words of description, in subordination to the preceding words, "all the tide lands between the line of high and low tide."

5. EASEMENTS BY PRESCRIPTION—HIGHWAYS.

To acquire a public right by prescription, the use by the public must be adverse, continuous, and exclusive. A mere tacit permission or license by the landowner will not suffice. Held, therefore, that the fact that a landowner for a long period of years permitted the residents of a neighboring village, and visitors thereto, to pass through his gate, and over his land, to an attractive beach on the seashore, created no prescriptive right to a public road through his land.

6. DEDICATION, HOW MADE.

Two things are necessary to a dedication as distinguished from a prescriptive right by long user: First, a dedication by the owner; and, second, an acceptance by the public. A dedication may be inferred from a long and uninterrupted user by the public with the knowledge and consent of the owner; but mere knowledge and nonaction or failure to assert one's rights are not conclusive evidence of a dedication, for they may be

rebutted, and the landowner is always allowed to show facts and circumstances to overcome the presumption. McKey v. Hyde Park Village. 10 Sup. Ct. 512, 134 U. S. 84, followed.

**7. MUNICIPAL CORPORATIONS—LIABILITY FOR ACTS OF OFFICERS.**

A county is liable for trespasses or damage done to private property by its officers, in the exercise of powers conferred for the benefit of the locality and its inhabitants, such as those relating to the opening and keeping open of roads, as distinguished from powers relating to the administration of the general laws and the enforcement of the general policy of the state.

**8. SAME—TRESPASS BY ROAD SUPERVISION—RATIFICATION BY COUNTY BOARD.**

The adoption or ratification by a board of county supervisors of acts of trespass committed by one of its members, who is also ex officio a road commissioner, claiming to act in his official capacity, renders the county liable, although such acts were not authorized, or ordered in advance.

**9. SAME.**

Where a member of a county board of supervisors in California, who was also ex officio a road commissioner, claiming to act in his official capacity, with the assistance of other citizens, repeatedly tore down a gate opening into private grounds, claiming that the road through such grounds was a public road by prescription or dedication, and thereafter the board of supervisors adopted a resolution declaring such road a public road, and caused it to be surveyed and recorded as such, *held*, that this was an adoption or ratification of said supervisor's acts, and rendered the county liable for the trespasses committed by him.

This was a suit in equity by Loren Coburn to restrain and enjoin respondent, the county of San Mateo, from trespassing on complainant's premises, situate in the county of San Mateo, state of California; also to recover damages for trespasses alleged to have been committed.

John L. Boone, for complainant.

Henry W. Walker, Dist. Atty., and Edw. F. Fitzpatrick and Craig & Meredith, for respondent.

MORROW, District Judge. This is a suit in equity to have an act of the legislature of the state of California entitled "An act to declare certain tide lands public grounds, and granting the same to the county of San Mateo in trust for the use of the public," approved February 27, 1893, and alleged by complainant to cover and include premises of which he is the sole and lawful owner, declared unconstitutional and void; (2) to restrain the respondent, the county of San Mateo, from trespassing upon complainant's premises, situate in the county of San Mateo, state of California, and lying on the shore of the Pacific Ocean; and (3) to recover damages for trespasses alleged to have been committed.

The complainant, Loren Coburn, is the owner of a tract of land originally forming part of a Mexican land grant known as the "Rancho Punta del Ano Nuevo," made to one Simeon Castro on May 27, 1842, by Juan B. Alvarado, then governor of California, for four square leagues. This grant was subsequently confirmed by the United States district court for the Northern district of California (Hoff. Land Cas. 172, Fed. Cas. No. 16,046), and thereafter, on the 3d day of December, 1857, a patent was issued by the government of the United States to Maria Antonio Pico, widow of Simeon Cas-

tro, and to Juan Castro, Manuel Castro I., Manuel Castro II., Jose Antonio, Maria Antonio, Jose Francisco, Jose Leandro, and Juan Bantista, the children and heirs of·said Simeon Castro, and to their heirs. The grant was by metes and bounds, and, as surveyed, contained 17,753.15 acres. The complainant acquired his title to all the westerly half of said ranch through certain mesne conveyances. His original deed is dated September 12, 1862. A subsequent deed from one Jeremiah Clark was a division of the rancho between said Clark and complainant, and is dated April 5, 1865. By this last deed complainant became the sole owner of the westerly half of said rancho, since which time he has been the sole owner and in full possession of the same. The tract of land comprised in this portion of said rancho lies, as stated, in San Mateo county, immediately south of the town of Pescadero, and is situated between the county road and the Pacific Ocean. It commences at Butano creek, a short distance south of the town of Pescadero, and extends about four miles in length in a southerly direction along the coast. The westerly boundary lies on the Pacific Ocean. The county road, which leads from Pescadero to the town of Santa Cruz, in Santa Cruz county, runs through this land at a distance of from one-half to three-fourths of a mile from the westerly boundary of the Pacific coast, and approximately parallel therewith. That portion of the tract of land lying between the county road and the Pacific Ocean has been used by complainant as a dairy ranch, with some farming and stock raising, ever since he first acquired possession of the property. Until about 1890, the property was rented to tenants, who conducted the dairy business. From 1890 to the bringing of this suit, in December, 1894, the complainant has had personal possession of the premises, and has been engaged in the dairy business on his own account. The land described was open and uninclosed until about 1874. During the latter year fences were built on each side of the county road, thereby inclosing the land. The dairy house of the ranch is situated about halfway between the ocean and the county road, inside of the fence; and a gate was erected in the line of fencing almost opposite the dairy house, thereby affording egress and ingress to this part of the ranch. Along the ocean side of this tract of land are several small beaches, one of which is known as "Pebble Beach," another as "Agate Beach," and still another as "Sapphire Beach." The first one, Pebble Beach, is the subject of controversy in this case. These beaches are small, sandy, or gravelly places; the largest, Pebble Beach, being about 200 feet in length by 50 feet in width; and they are located at a distance of from one to two miles apart, and are so called because stones or pebbles of the character indicated by the names of the beaches are found thereon. Prof. Henry G. Hanks, the state mineralogist for six years, made an official report upon the character of these beaches in 1884, which is contained in the Fourth Annual Report of the State Mineralogist, for the year ending May 15, 1884, pp. 326, 327. This report was introduced in evidence by the complainant. Prof. Hanks was also called as a witness. He testified to making a second and a later report, after another personal investigation of the beaches

at the instance of the complainant. This second report comprises also all that is salient of the first official report, made in 1884, and was introduced in evidence by the complainant. The testimony which the witness gave in this connection amounts simply to a repetition of what is substantially contained in the last report. It is as follows:

"In reply to your request that I express my opinion as to the question, 'Do the pebbles on Pescadero Beach come from the land, or are they cast up by the sea?' I make the following report: I made a thorough examination of Pescadero Beach, and published the results officially in the year 1884 in the Fourth Annual Report of the State Mineralogist of California, folio 326, as follows: 'The beach at Pescadero, San Mateo county, has a wide celebrity for the beautiful pebbles found there. These are nearly all quartz, agates, carnelians, jaspers, and chalcedony, of many beautiful varieties. On the shore, under a low bluff nearly at the sea level, a stratified sandstone dips from 65 to 72 degrees from the horizontal to the southwest. The strike is N. W. to S. E. magnetic. Under this, unconformably, lies a sedimentary formation, more recent, in horizontal strata, consisting of sand, water-worn boulders, and pebbles. This formation constitutes the bluff, and the pebbles on the beach result from its disintegration. The upper sedimentary seems to be formed from disintegration of the lower, which extends inland for an unknown distance. In the lower formations the sandstones are of different degrees of fineness, from the finest silt to very coarse conglomerate. In the conglomerate may be seen small boulders of chalcedony, jasper, agate, and porphyry, which are the same as those found on the beach; but the latter are concentrated by long-continued action of the waves, which have washed away the sand, disintegrated the sandstone boulders, and gathered the harder pebbles together on the beach. Some of the sandstones are cemented by oxide of iron, and all the loose sands are highly ferruginous. On the way from Pescadero to the beach the road is cut through a formation not stratified, but in which the boulders are imbedded. This general formation seems to be the same as is observed in the oil regions of San Mateo, Santa Clara, and Los Angeles counties.' Although at that time I fully made up my mind, I thought best to again visit the locality, which I did on the twenty-second day of March [1895]. I examined the beaches for a considerable distance north of Pebble Beach, and the bluff of sand and rocks, as well as the surface of the land for a considerable distance from the sea, and gathered and examined pebbles which had not been on the beaches, but were taken from the banks hundreds of feet inland. Some of these pebbles I present with this report. I find them to be mineralogically identical with those on Pebble Beach. I also obtained specimens of the underlying bedrock, and find it to be the sedimentary variety named 'arkoss,' formed apparently from decomposing granite. I noticed at several places in the bluffs along the beaches I examined outcropping strata of washed pebbles, a portion of which had fallen on the rocks below. These examinations fully confirm the opinion I formed eleven years ago. The sea along the coast of California between San Francisco and Pigeon Point is encroaching upon the land. The effects may be seen along the Pescadero beaches and at the high sedimentary bluffs between Lobetus and Half Moon Bay. The waves, which are resisted by the hard underlying rocks, erode easily the softer superimposed sediments which are continually falling from the banks. The breakers then dashing the detrital matter against the harder rocks wholly disintegrate it, the reflux sweeps away the lighter particles in the condition of sand, spreads them out on the beaches, and finally washes them beyond the surf. The heavier portions, including the pebbles, are able in a measure to resist by their gravity the action of the waves, and remain for a time exposed and concentrated; but they in turn are also swept out to sea, and a new crop from the caving bank takes their place. This operation has continued for a long period, and probably will for many centuries to come. The same kind of pebbles exist in the banks above other beaches, but in less quantity; and, owing to the form of the little bays, or other causes, the conditions differ, and the pebbles are sooner carried out to sea, or are at once covered out of sight by the sand. At several other localities on the California

coast there are pebble beaches similar to those of Pescadero, the most noted of which are those near Crescent City, in Del Norte county, and at Lake Tahoe."

Pebble Beach is a small semicircular cove, nearly in line with the dairy house and gate which opens into the county road. The waves beat up this cove, and, reaching the bluff, undermine it, and the pebbles are thus washed down from the vein which exists there onto the beach, where they can be picked up. This fact renders it a very attractive pleasure spot to visitors and travelers and to the people sojourning and living in and around Pescadero. In order to get to this beach on the land side, it is necessary to leave the county road, pass through the gate above referred to, and, after following the dairy road a short distance, turn to the left, and in this way pass over complainant's land. In this manner, a road was gradually formed over complainant's land, which led to this beach. It is to be observed, however, that prior to 1874 the land was, as stated, open and uninclosed, so that any one could wander from the county road down to the seashore. But in 1874 the fence was built with the gate referred to, and thereafter those who passed through opened the gate, entered and closed it behind them. They were permitted to do so by Mr. Coburn's tenants, for the reason that there was no special damage done to the premises or inconvenience caused by passing through the inclosure; in other words, the travel was not sufficient to call for serious objection. About the year 1890, Mr. Coburn took possession of the ranch, and commenced to conduct the dairy business himself. He testifies that he found that the continual passage of people over his land was getting to be a nuisance. He states that the gate was frequently left open, and his cattle and horses would get out, and stray away. Visitors would wander all over his place, stake out their horses, pitch tents, pick strawberries, etc. He put up notices warning the public against trespassing on his premises; but these were not heeded, and were removed or destroyed. As a last resort, he nailed up or fastened the gate that led from the road to the beach. Thereupon a considerable number of people, estimated at from 20 to 25, headed by H. B. Adair, a member of the board of supervisors of San Mateo county, came up from Pescadero to the complainant's place, and protested against this act of nailing the gate, claiming that the road was a public one, and that the complainant had no right to close the gate, or obstruct passage to the road. These people had axes, saws, and hammers with them, and they cut down the gate, destroyed some of the fencing adjoining the gate, and passed through the inclosure. The complainant was present, and remonstrated, but his protests were not heeded, and he was even threatened with bodily harm if he interposed. The supervisor referred to participated in the demolition of the gate. The road master was present, as was also a constable of the county, but the latter did not venture to interfere with the work of destruction that was going on, though he claims that he lent no assistance himself, but simply stood by, a silent and passive spectator. The complainant put up another gate, but this also was destroyed. In fact, during the entire period from the time that the

complainant closed his gate and premises to public admittance, which was some time in September, 1891, until the issuance of the injunction in this case, a continual warfare was carried on between the complainant on one side and the people of Pescadero, headed by the supervisor representing that district, on the other side, as to the right of way over complainant's lands to Pebble Beach.

It may be well to refer to the state of facts which engendered this animosity on the part of the people of Pescadero against the complainant, and their anxiety to have a passage over his land to the beach. Pescadero is a small town, consisting of some 200 or 300 inhabitants. It is one of the summer resorts of the county of San Mateo. One of the attractions of the place is Pebble Beach. A free, easy, and uninterrupted passage to the beach is a matter, therefore, of considerable interest to the hotels and livery stables. The bad feeling and prejudice that sprang up against the complainant, when he attempted to lock his gate, and cut off the public from passing over his land to the beach, can, therefore, be very readily understood. To settle any question about the proprietorship of Pebble Beach, an act of the legislature of the state was procured in 1893, entitled "An act to declare certain tide lands public grounds, and granting the same to the county of San Mateo in trust for the use of the public." This act was approved as law on February 27, 1893. It reads as follows:

"Section 1. That all the tide-lands between the line of high and low tide, described below, are hereby dedicated as public grounds, and the title thereto is granted to the county of San Mateo in trust for the use of the public, and without the power to sell or in any manner to dispose of the same, or any part thereof; said lands shall be made and kept accessible to the public for the purpose aforesaid. The lands above-mentioned are described as follows: Being all the lands between high and low tide along the shore of the Pacific Ocean commencing at the mouth of Pescadero creek, and running southerly with the shore line of said ocean to a point known as the mouth of 'Bean Hollow Lagoon,' about three miles distant, and including all those tide-lands usually known and called 'Pebble Beach,' situate, lying and being in the county of San Mateo, state of California."

Two months subsequently, at a regular meeting of the board of supervisors of San Mateo county, held on May 1, 1893, a resolution was adopted declaring the road leading to Pebble Beach a public road, and ordering that said roadway be recorded as a public highway in said county, in the proper book kept by the county clerk, as required by law. At a much later date, viz. at an adjourned meeting, held on November 13, 1894, upon motion of Supervisor Adair, the board of supervisors instructed the county surveyor to survey the county road from Pescadero to Pebble Beach in the fifth township, and to make a report of the same to the board. A report was duly made, and the field notes of the survey were introduced in evidence.

The complainant claims, and alleges in his bill, that the act of the legislature of the state of California, referred to, is unconstitutional and void, because no authority or power existed in the legislature to enact and pass the same, and that said act is in contravention of certain sections of the constitution of the United States and of the state of California, particularly of article 5 of the amendments to

the constitution of the United States, and of section 14 of article 1 of the constitution of the State of California, both of which provide substantially that private property shall not be taken for public uses without just compensation. The complainant prays (1) that the said act be declared unconstitutional and void; (2) that the said respondent, its officers, agents, and workmen, be perpetually restrained and enjoined from trespassing upon or in any way injuring or molesting complainant's said property, lands, and the possession thereof; (3) that the complainant be decreed to be the sole and exclusive owner and entitled to the use and possession of the said Pebble Beach, and all the appurtenances, rights, privileges, and easements pertaining thereto. Then follow prayers for damages and injunction. The answer of the respondent denies that the complainant is the owner, or seised in fee, of the said tract of land. It further avers, with respect to Pebble Beach, that the respondent, the county of San Mateo, "is the owner in fee of the said tract of land described as 'Pebble Beach,' and it further avers that it owns and is seised in fee of the said Pebble Beach for public purposes,— that is to say, as a public common or recreation ground,—and avers that the same has been at all said times and is dedicated to the use of the public as such."

It is evident from this statement of facts and the issues raised by the pleadings that the first question to be determined is, how far does the complainant's western boundary to his tract of land extend? Does it include the land between high and low water mark, and does it include Pebble Beach? The constitutionality of the act of the state legislature declaring the tide land at Pebble Beach a public common or recreation ground depends on the determination of this question. If complainant's western boundary extends only to high-water mark, and does not include the beach, then the act referred to, so far as it purports to affect the tide land or beach between high and low water mark, is obviously constitutional; it being well settled law that the title to all tide lands is in the state, unless, indeed, a grant was made by the government of Mexico before the territory composing the state of California became a part of the United States, expressly covering the tide land in question, in which event the government of the United States, by virtue of article 8 of the treaty of Guadalupe Hidalgo, would be bound to protect all private right to such land as against the state. But if the grant from the Mexican government covers and includes the tide land in question, then the act would be unconstitutional, the state having no title to it, and being, therefore, without authority to donate or appropriate it for any purpose whatever. The description of the boundaries contained in the original grant from the Mexican government, and followed in the patent granted by the United States upon the confirmation of the title by the land commissioners and the United States courts, reads as follows:

"Bordering on the east on the sierra, to the west on the sea, to the north on the rancho of Don Juan Gonzales, and to the south on the rancho of Dona Ylaria Buelna; said tract being in longitude from north to south four leagues,

a little more or less, and in latitude from east to west one league; containing four square leagues."

What is the meaning of the expression, "to the west on the sea"? Does it mean to high or low water mark? The admission of a state to the Union entitles it to all the lands below ordinary high-water mark and above ordinary low-water mark; in other words, to all the tide lands. Bissell v. Henshaw, 1 Sawy. 553, 579, Fed. Cas. No. 1,447; Seabury v. Field, McAll. 1, Fed. Cas. No. 12,574; Griffing v. Gibb, McAll. 212, Fed. Cas. No. 5,819; Martin v. Waddell, 16 Pet. 367; Pollard v. Hagan, 3 How. 212, 230; Goodtitle v. Kibbe, 9 How. 477. By the common law, the title in the soil of the sea, or of arms of the sea, below high-water mark, except so far as private rights in it have been acquired by express grant or by prescription or usage, is in the crown, subject to the public rights of navigation and fishing. Fitzwalter's Case, 3 Keb. 242, 1 Mod. 105; 3 Shep. Abr. 97; Com. Dig. "Navigation," A, B; Bac. Abr. "Prerogative," B; Rex v. Smith, 2 Doug. 441; Attorney General v. Parmeter, 10 Price, 378, 400, 401, 411, 412, 464; Attorney General v. Chambers, 4 De Gex, M. & G. 206, 4 De Gex & J. 55; Malcomson v. O'Dea, 10 H. L. Cas. 591, 618, 623; Attorney General v. Emerson [1891] App. Cas. 649; Attorney General v. Johnson, 2 Wils. Ch. 87, 101–103; Gann v. Free Fishers, 11 H. L. Cas. 192; Smith v. Stair, 6 Bell, App. Cas. 487; Lord Advocate v. Hamilton, 1 Macq. 46, 49. See, also, Lord Hale, in Harg. Law Tracts, 11, 12, 17, 18, 27, 36, 84, 85, 89. The common-law rule upon this subject has been held to be the law of this country. Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, and cases there cited. There is, however, a further limitation to this generally recognized rule with respect to private rights over tide lands acquired under a former government, which tide lands have, since their acquisition, become part of the domain of this country. The general rule, and the limitation to it, are very clearly stated in Knight v. Association, 142 U. S. 161, 183, 12 Sup. Ct. 258. Mr. Justice Lamar, delivering the opinion of the court, and passing upon the right of the city and county of San Francisco, by virtue of a grant derived from the Mexican government as a pueblo, to certain tide lands, said:

"It is the settled rule of law in this court that absolute property in and dominion and sovereignty over the soils under the tide waters in the original states were reserved to the several states, and that the new states since admitted have the same rights, sovereignty, and jurisdiction in that behalf as the original states possess within their respective borders. Martin v. Waddell, 16 Pet. 367, 410; Pollard v. Hagan, 3 How. 212, 229; Goodtitle v. Kibbe, 9 How. 471, 478; Mumford v. Wardwell, 6 Wall. 423, 436; Weber v. Commissioners, 18 Wall. 57, 65. Upon the acquisition of the territory from Mexico the United States acquired the title to tide lands equally with the title to upland; but with respect to the former they held it only in trust for the future states that might be erected out of such territory. Authorities last cited. But this doctrine does not apply to lands that had been previously granted to other parties by the former government, or subject to trusts which would require their disposition in some other way. City and County of San Francisco v. Le Roy, 138 U. S. 656, 11 Sup. Ct. 364. For it is equally well settled that when the United States acquired California from Mexico by the treaty of Guadalupe Hidalgo (9 Stat. 922) they were bound, under the eighth article of that treaty, to protect all rights of property in that terri-

tory emanating from the Mexican government previous to the treaty. Tesche-
macher v. Thompson, 18 Cal. 11; Beard v. Federy, 3 Wall. 478. Irrespective
of any such provision in the treaty, the obligations resting upon the United
States in this respect, under the principles of international law, would have
been the same. Soulard v. U. S.. 4 Pet. 511; U. S. v. Percheman, 7 Pet. 51,
87; Strother v. Lucas, 12 Pet. 410, 436; U. S. v. Repentigny, 5 Wall. 211,
260."

See, also, City and County of San Francisco v. Le Roy, 138 U. S.
656, 670, 672, 11 Sup. Ct. 364.

In More v. Massini, 37 Cal. 432, it appeared that the Mexican
government, in 1846, had granted to Daniel A. Hill one league of
land in what is now the county of Santa Barbara. The United
States district court confirmed the grant to Hill, and the pres-
ident of the United States issued to him a patent therefor, March 10,
1865. The description, so far as it is material to this case, con-
tained in the patent, which in turn recited the decree of confirma-
tion of the board of land commissioners and of the district court
for the Southern district of California, reads: "Bounded on the
south by the seashore." Where the land fronted on the seashore,
between high and low tide, were mines of asphaltum. The defend-
ants were engaged in mining the asphaltum, and this action was
brought to recover damages for mineral already extracted, and to
obtain an injunction restraining mining operations. The defend-
ants claimed to be working under and in pursuance of the mining
customs of California, and denied plaintiff's title to the land below
high tide. The court below was of the opinion that the patent
conveyed the land between high and low water, and gave judgment
in favor of the plaintiff for damages, and granted a perpetual in-
junction. The defendants appealed. In reversing the judgment of
the lower court, Mr. Justice Rhodes held that the expression "sea-
shore" included land extending only to high-water mark. It is con-
tended by counsel for complainant that the authority of More v.
Massini is not applicable to the facts of the case at bar, because
in that case the boundary was to the "seashore," whereas in the
case at bar it is to the "sea,"—an expression claimed by counsel
to be much broader in its signification. But I cannot assent to
the distinction sought to be drawn. It seems to me to be too nar-
row and refined. The descriptions of the boundaries in both cases
were worded in very general terms. For all the ordinary purposes
of a boundary, where the ocean, or a bay, or other body of water
affected by the flux and reflux of the tide, is made a limit, the words
"seashore" and "sea," in the absence of any showing to the con-
trary, appear to me to be practically synonymous. It is further
claimed by counsel for complainant that the earlier decisions of the
supreme court of the state in Teschemacher v. Thompson, 18 Cal.
11, and Ward v. Mulford, 32 Cal. 365, are more in point, and are
directly opposed to the authority of More v. Massini. With respect
to the applicability of the cases of Teschemacher v. Thompson and
Ward v. Mulford, I agree with the views expressed by Mr. Justice
Rhodes in the introductory part of his opinion in More v. Massini,
when he says:

"In Teschemacher v. Thompson, 18 Cal. 11, it was admitted that the patent of the United States to the plaintiffs embraced the lands in controversy; and the lands in dispute in Ward v. Mulford, 32 Cal. 365, were within the lines of the survey, and were embraced by the patent from the United States. Were that the position of the lands in dispute in this case, the authority of those cases would be decisive of this. But the question here is whether the lands in controversy—that is to say, the lands below the line of ordinary high tide of the Pacific Ocean—are embraced within the patent."

This is precisely one of the questions involved in the case at bar. But, even if the authority of More v. Massini can be distinguished from the present case, that of U. S. v. Pacheco, 2 Wall. 587, would seem to be directly in point, and conclusive of the question presented here. In that case the district court had confirmed the survey and location of a Mexican grant for three square leagues of land, situated on the east side of the Bay of San Francisco. The decree described the land as bounded "on the west by the Bay of San Francisco." The survey embraced marsh land covered by the monthly tides, but excluded lands covered by the daily tides. From the decree approving this survey the United States took an appeal to the supreme court in the interest of the settlers on the upland, who desired to have the grant so located that the bay, as a boundary, would be the line of low-water mark, thereby including in the grant marsh lands covered by the daily tides, and excluding an equal amount of upland. Mr. Justice Field, delivering the opinion of the court, said:

"The decree of the district court confirms the claim of the respondents to the extent of three square leagues, and describes the land as bounded   *   *   * on the west by the Bay of San Francisco.   *   *   * On the side of the bay there are about two leagues of salt or marsh land. The whole of this land is covered by the monthly tides at the new and full moon, and a part of the land is covered by the daily tides. And the objection taken to the survey approved by the district court is that it does not include this marsh land as a part of the tract confirmed. The objection is made on the supposition that the lines given by the decree do not close; that a fourth line is necessary to complete the boundaries, and that this fourth line must be determined by the quantity confirmed, and so drawn as to include it; and that by the bay as a boundary in this case is meant the line of low-water mark.   *   *   * By the common law, the shore of the sea, and, of course, of arms of the sea, is the land between ordinary high and low water mark, the land over which the daily tides ebb and flow. When, therefore, the sea, or a bay, is named as a boundary, the line of ordinary high-water mark is always intended where the common law prevails. 3 Kent, Comm. 427. And there is nothing in the language of the decree which requires the adoption of any other rule in the present case. If reference be had to the rule of the civil law, because the bay is given as a boundary in the grant from the Mexican government, the result will be equally against the position of the appellants."

The decree confirming the survey was affirmed. The contention of counsel for complainant that the civil or Roman law has always been the recognized law of Mexico, and that under that law the doctrine of state ownership of the beach between high and low water does not obtain, is probably correct, but it does not follow that under that law a colonization grant of upland bounded by the sea includes the beach or shore. In the case just cited Judge Field holds that because the bay was given as the boundary in the grant

from the Mexican government was of no avail to support the claim that the grant extended to low-water mark.

But it is further contended by counsel for respondent that the complainant has not only failed to show title in himself below high-water mark, but that he has also utterly failed to show that his grant extends to that point. It is claimed that, on the contrary, he has shown, if he has shown anything at all, that the westerly boundary of his tract is the bluff above ordinary high-water mark. The meander lines delineated on the plat of the Rancho Punta del Ano Nuevo, surveyed by the United States surveyor general in 1857, and attached to the patent, are referred to, to establish this contention. The respondent also introduced in evidence a copy of a part of the tracing of a map of a portion of the coast of California, including the tract of land in question, surveyed by the United States coast survey in 1854. This map contains the meander lines, bordering on the sea, of the Rancho Punta del Ano Nuevo. The particular meander line which affects Pebble Beach, viz. "South, 26. 30′ west, 6 chains and fifty links, to station," as it appears in both of these maps, shows that the western boundary line of complainant's land is on the bluff bordering the sea, and not on the beach, and it is claimed that Pebble Beach is outside of complainant's land. The complainant, on his part, has also introduced a map based upon a survey made by S. P. Johnson, who was called as a witness. This survey was made in September, 1895, at the request of the complainant. The meander line which affects Pebble Beach, as it is delineated on this map, is not on the bluff, but beyond it, on the beach itself. This discrepancy between the old maps of 1854 and 1857 and that of 1895 is explained by the fact that the sea has been encroaching upon the land at Pebble Beach, and has, by the slow and imperceptible process of erosion, worn into the bluff. It would, therefore, seem that even if Pebble Beach were outside of the original survey lines made in 1854 and 1857, it is now, assuming complainant's latest survey to be correct, within his survey lines. But I do not attach much importance to these meander lines, for it is well settled that they do not limit the boundary of the grant. Their purpose is to ascertain the quantity of land to be charged for. Railroad Co. v. Schurmeir, 7 Wall. 272; Jefferis v. Land Co., 134 U. S. 178, 10 Sup. Ct. 518; Hardin v. Jordan, 140 U. S. 371, 380, 11 Sup. Ct. 808, 838; Mitchell v. Smale, 140 U. S. 406, 11 Sup. Ct. 819, 840. In Hardin v. Jordan, supra, Mr. Justice Bradley thus defined these lines:

"It has been the practice of the government from its origin, in disposing of the public lands, to measure the price to be paid for them by the quantity of upland granted, no charge being made for the lands under the bed of the stream or other body of water. The meander lines run along or near the margin of such waters are run for the purpose of ascertaining the exact quantity of the upland to be charged for, and not for the purpose of limiting the title of the grantee to such meander lines. It has frequently been held, both by the federal and state courts, that such meander lines are intended for the purpose of bounding and abutting the lands granted upon the waters whose margins are thus meandered, and that the waters themselves constitute the real boundary."

Mr. Justice Clifford, in Railroad Co. v. Schurmeir, supra, said:

"Meander lines are run, in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser. In preparing the official plat from the field notes, the meander line is represented as the border line of the stream, and shows to a demonstration that the water course, and not the meander line as actually run on the land, is the boundary."

The same principle would obtain in surveying the boundary of a Mexican grant. The meander line running along the margin of the sea would determine quantity, but would not limit the title of the grantee to such as against an intruder coming in between that line and the sea, nor would it extend the beach beyond its natural boundary.

My conclusion upon the question of the extent of the western boundary of complainant's land is that he takes to high-water mark, and no further, and that the act of the legislature of the state of California of February 27, 1893, in so far as it purports to set apart as public grounds the tide lands at the place called "Pebble Beach," is constitutional as to the land between high and low water mark. If it purports to do more, it is unconstitutional and void to that extent. Complainant urges that, as the act uses the words "Pebble Beach," it was intended to include the entire beach, whether inside of complainant's western boundary of high-water mark or not. But it is my opinion that the words "Pebble Beach" were intended simply as words of description, and were used in subordination to the preceding language of the act, which applies particularly and only to "all the tide lands between the line of high and low tide." Besides, the word "beach" has a well-settled meaning in law. It is deemed the equivalent of the word "shore." Storer v. Freeman, 6 Mass. 435. See, also, Providence Steam Engine Co. v. Providence & S. S. Co., 12 R. I. 348. In Niles v. Patch, 13 Gray, 254, it was said that the word "'beach,' in its ordinary signification, when applied to a place on tide waters, means the space between ordinary high and low water mark, or the space over which the tide usually ebbs and flows. It is a term not more significant of a sea margin than 'shore,' and 'bounding on the shore' does not include the 'shore.'"

We now come to the second question involved, as to whether the respondent, as a public body, has acquired the right to pass over complainant's land to Pebble Beach by virtue of long user or prescription, or by dedication. The importance of this proposition in rendering Pebble Beach accessible to the public is obvious. The land, prior to 1874, was open and uninclosed. The respondent introduced many witnesses, old residents in and around Pescadero, who testified to the fact that the residents and visitors to the town were wont to travel to Pebble Beach for pleasure and recreation for a long period of years, and that they passed over complainant's land to do so. When the fence was put up, such travel as there was passed through the gate, and followed the road that led to.

the beach in question. The complainant substantially admits the user, but emphatically and positively denies that he ever acquiesced in or had knowledge or intended that any prescriptive right should be based on the user. He maintains that such travel as there was was only through sufferance, and that he never intended that such permissive user should be construed as an indication on his part of dedicating the road to the public. He testifies that as long as he suffered no particular inconvenience from the visits of travelers or pleasure seekers, he did not object to their passing through his gateway and using the road over his land leading to the beach; but when travel increased, and he was subjected to inconveniences, when his land was trespassed upon, his gate left open, and his cattle and horses strayed away, etc., he determined to put a stop to it, and accordingly posted up notices against trespassing. When he found that these notices were not heeded, and were destroyed or torn down, he closed the gate to the public. He certainly did everything an owner could well do to show that he did not consent to any claim of prescriptive right as a public road, nor did he assent to any dedication of the same for public purposes. It would serve no useful purpose to go at length into the testimony on this point. Suffice it to say that the respondent, on whom lies the burden of establishing a prescriptive right, or a dedication, of the road, has failed to show a single act or expression on the part of the complainant that he ever intended or desired or consented that the road should be used as a public road. The only ground on which the respondent can rely is that of user. But the mere user of a private road is not inconsistent with the license or permission of the owner to use the road. The mere fact that the complainant permitted at first, and for a long period of years, residents in and around the little town of Pescadero, where he resided himself, and visitors to that place, to visit Pebble Beach, and to pass over his land to do so, does not, of itself, and so far as the facts of this case are concerned, constitute such user as can be said to amount at the common law to a prescriptive right on the part of the public to use the road. In Warren v. Jacksonville, 15 Ill. 241, it was attempted to infer a dedication of a road over lands which were open and uninclosed and in common. The court said:

"The use and occupation of this portion is only about seven years, without any proof of assent or dissent. While so much land lying in common in this country remains free to public uses and travel, until circumstances induce owners to inclose, we can deduce no strength or inference or conclusion from mere travel across it by the public without objection from the owner. It is neither the temper, disposition, fashion, nor habit of the people or custom of the country to object to the community enjoying such privileges until owners wish to inclose." See Ang. Higw. p. 164, § 151.

The elements which go to make up a prescriptive right are three. The user must be (1) adverse, (2) continuous, and (3) uninterrupted. Now, in the case at bar, whatever else may be said in favor of the continuity and uninterrupted character of the user, still the facts do not justify, in my opinion, the conclusion that the user was adverse to the owner of the land. In 19 Am. & Eng. Enc. Law, p. 11, it is said:

"The adverse use which will give title by prescription to an easement is substantially the same in quality and characteristics as the adverse possession which will give title to real estate. As in the case of adverse possession, it must be continued for a long period; it must be adverse, under a claim of right, exclusive, continuous, uninterrupted, and with the knowledge and acquiescence of the owner of the estate out of which the easement is claimed."

And again, on page 23, it is further said:

"No title by prescription can be acquired in an easement without the acquiescence and knowledge of the owner of the servient estate. The user must not be clandestine or by stealth, but open, notorious, visible, and indisputable. When the user is of such a character and under a claim of right, the owner of a servient tenement is charged with notice, and his acquiescence is implied."

In Huffman v. Hall, 102 Cal. 26, 36 Pac. 417, it was held that the fact that the land had been inclosed by a fence would show that any use of it by the public for a way was only permissive, and is strong evidence in support of a mere license to the public to pass over the designated way, and in rebuttal of a dedication to public use. See, also, Quinn v. Anderson, 70 Cal. 456, 11 Pac. 746. Furthermore, I do not think that the use made of the road was such a public use as is contemplated by the law. It was confined to residents from Pescadero and the neighborhood, and visitors and pleasure seekers sojourning at that place during the summer season. It was testified that the existence of these pebbles, which constitute the great attraction and inducement for people to visit the beach, had been known to the public generally only for the last 10 years. Prior to that time the travel, if it can be termed such, was extremely light, being confined to a few hunters, fishermen, and pleasure seekers. The act of the state legislature, declaring it a place of recreation, was passed only in 1893. The first steps to have the road leading to the beach declared a public road were taken some two months subsequently. The public necessity for a road to that place could, therefore, not have been very great. In McKey v. Hyde Park Village, 134 U. S. 84, 10 Sup. Ct. 512, which involved a common-law dedication of a street, the supreme court said, through Mr. Justice Lamar:

"This is an action of ejectment, brought in the circuit court of the United States for the Northern district of Illinois by William D. McKey against the village of Hyde Park to recover possession of a strip of land 23 feet wide and 150 long, used and occupied by the village as a part of a street known as 'Forty-First street.' The ground of McKey's complaint is that the village, in locating and opening that street, entered upon, and unlawfully took possession of, his land to the extent of the above-mentioned strip, ejected him therefrom, and withholds from him the possession thereof. The defendant filed a plea of not guilty, and at the trial contended that the street, including that strip, was properly located, and was rightfully used as a public highway by virtue of a common-law dedication, and also under a deed from plaintiff's co-tenant, with the acquiescence of plaintiff, through a long period of years."

The judgment in the lower court went in favor of the defendant, and plaintiff appealed to the supreme court, and cited, as one of the errors, the instruction of the court to the jury regarding the question of dedication. The instruction was as follows:

"If you believe from the evidence that in 1874, when the plaintiff attained his majority, he knew of the action of the village of Hyde Park in laying out,

opening, and improving the street, and that thereafter, and until the partition suit was commenced, in 1881, or later, the street was maintained and used with his knowledge, and without objection by him, you are authorized to infer that he consented to a dedication to that use of so much of the McKey tract as is embraced within the present limits of the street."

This instruction was repeated in the following more unqualified language:

"The plaintiff became of age in 1874, and if the village of Hyde Park took possession of this strip of land in 1873, and he knew of that possession, and made no objection; if with full knowledge of everything that was done from 1874, when he was of age, until Mr. Greeley informed him for the first time that he was the owner or part owner of the 23 feet,—then he cannot recover as against the village of Hyde Park."

The court then proceeds to say, in commenting on these instructions, that:

"However correct, technically, as an abstract proposition, the first part of this charge may be, we do not think the last paragraph of it, above quoted, states the law of Illinois as to what constitutes a dedication of real property in that state, as interpreted by her supreme court. In City of Bloomington v. Bloomington Cemetery Ass'n, 126 Ill. 221, 227, 228, 18 N. E. 298, the court laid down the principle that mere 'nonaction will not raise an implication of an intention to dedicate private property to public use, nor will it estop the owner to deny such intention.' After repeating the doctrine in the language of preceding cases, the court proceeded thus: 'But it is said that he and his grantee, the plaintiff, should be estopped to deny a dedication because of the public user of the land in question as a part of the street without objection on their part. Had the plaintiff, or its grantor, by any equivocal overt acts or declarations, given evidence of an intention to have the land in question included in the street, and thereby induced the public to use and the city to improve it as a part of the street, possibly the doctrine of estoppel might have been invoked. No such acts or declarations are, however, shown. All that is proved is mere nonaction on their part, or, in other words, a mere omission to assert their title as against the public. Mere nonaction will not raise an implication of an intention to dedicate private property to public use, nor will it estop the owner to deny such intention.' See, also, Herhold v. City of Chicago, 108 Ill. 467; Peyton v. Shaw, 15 Ill. App. 192. In Kyle v. Town of Logan, 87 Ill. 64, 66, 67, the court states the same doctrine as follows: 'In order to justify a claim that title to a tract of land has been divested by dedication, the proof should be very satisfactory either of an actual intention to dedicate or of such acts and declarations as should equitably estop the owner from denying such intention. * * * The owner of the land must do some act, or suffer some act to be done, from which it can be fairly inferred he intended a dedication to the public. Acquiescence, with knowledge of the use by the public, without objection, is not, as held by the circuit court, conclusive evidence of a dedication, for it may be rebutted. The second instruction for appellees, announcing this principle, was erroneous. A dedication, from a user of twenty years, and for a shorter time, may be presumed, but it is not conclusive. The owner might show any fact which would overcome the presumption.' In City of Chicago v. Johnson, 98 Ill. 618, 624, 625, the court laid down the doctrine on this subject as follows: 'A dedication of private property to public uses will not be held to be established, except upon satisfactory proof, either of an actual dedication, or of such acts or declarations as should equitably estop the owner from denying such intention. This proposition is so clearly the law, it needs the citation of no authorities in its support.' In the still earlier case of McIntyre v. Storey, 80 Ill. 127, 130, the court said: 'A dedication of the right of way for a highway may be variously proven. It may be established by grant or written instrument, or by the acts and declarations of the owner of the premises. It may be inferred from long and uninterrupted user by the public, with the knowledge and consent of the owner. But this court has had frequent occasion to say there must be a clear intent shown to make the dedication. The evidence offered for that purpose should be clear, either of an actual intent so to do, or of such acts

or declarations as will equitably estop the owner from denying such intent,'—citing Marcy v. Taylor, 19 Ill. 634; Kelly v. City of Chicago, 48 Ill. 388; Godfrey v. City of Alton, 12 Ill. 29. In City of Chicago v. Stinson, 124 Ill. 510, 513, 514, 17 N. E. 43, the court said: 'Before title can be divested by dedication, the proof must be very satisfactory either of an actual intention to dedicate, or of such acts or declarations as should equitably estop the owner from denying such intention;' citing Kelly v. City of Chicago, 48 Ill. 388. 'Long use and long acquiescence in such use by the owner of land are sometimes regarded as, in and of themselves, evidence of a dedication. In cases, however, of implied or presumed acquiescence or consent on the part of the owner, very much depends upon the location of the road or street, the amount of travel, the nature of the use of the public, the rights asserted by the public, the knowledge of the owner, and like circumstances;' citing Onstott v. Murray, 22 Iowa, 457. We have said: 'Acquiescence, with knowledge of the use by the public, without objection, is not * * * conclusive evidence of a dedication, for it may be rebutted;' citing Kyle v. Town of Logan, 87 Ill. 64. The two prominent elements to be considered in determining whether there has been a common-law dedication or not are the intention of the owner to dedicate, and the acceptance by the public of the intended dedication. 'The owner of the land must do some act, or suffer some act to be done, from which it can be fairly inferred he intended a dedication to the public;' citing Kyle v. Town of Logan, supra. Under these authorities we think the court below committed error in that part of the charge to which we have just referred. The principle established by them is that dedication of a street or highway may be inferred from a long and uninterrupted user by the public with the knowledge and consent of the owner, but that mere knowledge and nonaction or failure to assert one's rights are not conclusive evidence of such dedication, for they may be rebutted; and the party is always allowed to show facts and circumstances to overcome such presumption."

Much that is said in the above case is clearly applicable to the question of dedication urged in the case at bar. There are, however, a few other principles which should be stated. In the first place, two things are requisite to a dedication, as distinguished from a prescriptive right by long user: First, a dedication by the owner; and, second, an acceptance by the public. The burden of showing both of these requisites is on the respondent. There is no evidence whatever that the complainant ever intended to dedicate Pebble Beach road to the public. His mere nonaction, we have seen, is insufficient, of itself, to establish a dedication. Washb. Easem. p. 186, thus states the doctrine:

"To constitute a dedication of land to a public use, there must first be an intention to do it on the part of the owner. And this must be unequivocally and satisfactorily proved. But it may be manifested by writing, by declaration, or by acts. Dedications have been established in every conceivable way by which the intention of the party could be manifested. Without that, no dedication can take place; and if, for instance, in opening a passageway of a character that might otherwise be deemed a public way, the owner of the land should place a gate at its entrance, by which such passage may be closed, it would be regarded as negativing the intention to make it a public way; nor would it become so by the gate being suffered to go to decay or ceasing to be used."

And again, at page 182, the same author says:

"But to constitute a dedication there must be an abandonment by the owner to the use of the public exclusively and not a mere user by the public in connection with a use by the owners, in such measure as they desire."

See, also, the case of Irwin v. Dixon, 9 How. 10, 31, et seq., where the entire question of dedication is elaborately considered by Mr. Justice Woodbury.

Counsel for respondent rely greatly upon the decision of the supreme court of the state in Schwerdtle v. Placer Co., 108 Cal. 589, 41 Pac. 448, to establish a prescriptive right to the road. In that case it was found that the public, from the year 1850 to 1887, had used the road openly, notoriously, and continuously, and adversely to plaintiff. Such cannot be said to be the fact in the case at bar. In the case cited, the owner of the tract including the strip used as a street asked permission of one of the members of the board of supervisors to place gates across the road at the inlet and outlet of the same, which permission was granted. The supreme court, in commenting on this fact, held it to be rather an acknowledgment than a denial of the public right. In the case at bar the complainant erected his fences and gate in 1874. When he found that the passing and repassing of people over his land was becoming a nuisance, he, as a last resort, nailed up his gate. He did not solicit any permission to do this from the board of supervisors or from the road master of the county. When his gate was cut down and destroyed, he put up another, and all the time protested and opposed the trespasses and molestations of the people from and around Pescadero, and of those who took part in tearing down the gate, and in seeking to keep the road to Pebble Beach open and unobstructed. A significant fact, to my mind, tending to show that before the passage of the act of the state legislature declaring Pebble Beach a public recreation ground the officials of the county and the public in and around there did not regard Pebble Beach road more than as a private road, is that when complainant erected his fence and gate, no objection was made. This was in 1874, or thereabouts. No effort was ever made by the county to declare the road a public highway in accordance with the law until 1893, almost 20 years after. Section 25 of "An act to prescribe the duties and provide the salaries of certain officers of San Mateo county; to authorize the issue of bonds for road purposes and other matters relating thereto," passed by the state legislature of 1873–74, and approved March 18, 1874, provides:

"All roads, public or private, heretofore petitioned for, viewed, located, laid out and declared public or private roads by the board of supervisors of San Mateo county in the manner and form prescribed by the laws on that subject then in force in the said county of San Mateo, and for which the damages awarded have been paid as provided by said laws, are hereby declared to be public or private roads, as the case may be, and the same be opened and improved in the same manner as if the laws under which they were laid out were still in force, except that the same shall be done by the officers prescribed by laws now or hereafter in force in the county."

Nothing was done, in accordance with the provisions of this act, until May 1, 1893, two months subsequent to the act declaring Pebble Beach a place of recreation for the public. This state of the case is inconsistent with the idea that the public considered the road as a public road, and is consistent with the fact that the user of the road was by the tacit license or permission of complainant, which, of itself, is enough to defeat a prescriptive right to the road. Washb. Easem. (4th Ed.) p. 197, § 5. Section 2622 of the Political Code of the state of California further requires that:

"The clerk of the board of supervisors shall include in the minutes of the board of supervisors all proceedings of the board relative to each road or road district, including orders for laying out, altering, and opening roads; he must also keep a road register, in which must be entered the number and name of each public highway in the county, a general reference to its terminal points and course, also the date of the filing of the petition or other papers, a memorandum of every subsequent proceeding in reference to it, with the date thereof, and the folio, and the volume of the minute book where it is recorded."

While, at the meeting of May 1, 1893, it was ordered that the road be recorded as a public highway in the proper book kept by the county clerk, and as required by law, no book or record showing that such had been done was produced. We must, therefore, infer that no such record was ever made. Where a party has it within his power to produce evidence favorable to his contention, if such evidence exists, and fails to do so, a presumption arises that such evidence does not exist; otherwise it would have been produced. Code Civ. Proc. § 1963, subd. 5. Upon the whole of the case, I am unable, from the testimony produced, to affirm that there was any such adverse user as would constitute a right by prescription to Pebble Beach road under the law of this state, nor that there was any dedication by complainant of the road for public purposes.

We now take up the question of the responsibility of the county of San Mateo for the acts of its officers, agents, and employés in the damage which was done to complainant and his property in tearing down his gate and a portion of the fence, trespassing upon his property, and violating his general rights as owner. It follows, necessarily, that if the road was not a public road, no one had any right to commit trespasses on complainant's land, or do anything to compel him to open the road, and admit the public generally to its use. But the question to be determined now is, what share of responsibility, if any, is attached to the county of San Mateo, as a public body, for those tortious acts? The counsel for respondent contends that the county of San Mateo, through its board of supervisors, never authorized nor ratified these various acts of trespass, nor did they authorize or indorse the acts of one of their number, Supervisor Adair. It is contended that whatever was done by the latter was so done upon his personal responsibility and independently of his official position as supervisor. It becomes necessary to inquire what powers the board of supervisors, and the supervisors individually, possess with respect to roads, and then to ascertain what action the board collectively, or a supervisor individually, took, so far as their records of proceedings disclose, with reference to Pebble Beach road.

Pol. Code Cal. § 2621, provides that:

"No route of travel used by one or more persons over another's land shall hereafter become a public road or by-way by use, until so declared by the board of supervisors or by dedication by the owner of the land affected."

This provision took effect with adoption of the Codes, January 1, 1873.

Section 2622 provides, as stated, that all public roads shall be registered.

Section 2641 of the same Code provides, with reference to the powers and duties of highway officers, that:

"The board of supervisors of the several counties shall divide their respective counties into suitable road districts, and may change the boundaries thereof, and each supervisor shall be ex-officio road commissioner of the several road districts in his supervisor district, and shall see that all orders of the board of supervisors pertaining to roads in his district are properly executed. * * *"

Section 2642 provides for the appointment of a road master or road overseer.

Section 2643 provides that the boards of supervisors of the several counties of this state shall have general supervision over the roads within their respective counties. They must, by proper ordinance—

"(1) Cause to be surveyed, viewed, laid out, recorded, opened, and worked such highways as are necessary to public convenience, as in this chapter provided. (2) Cause to be recorded as highways such roads as have become such by usage, dedication, or abandonment to the public. * * *"

Several other subdivisions follow, further defining their powers and duties over public roads. Section 2645, as amended in 1893 (see Statutes and Amendments to the Codes, 1893, pp. 113, 115), provides:

"Road commissioners, (supervisors) under the direction and supervision and pursuant to orders of the board of supervisors, must: (1) Take charge of the highways within their respective districts, and shall employ all men, teams, watering carts, and all help necessary to do the work in their respective districts when the same is not let by contract," etc. "(2) Keep them clear from obstructions, and in good repair," etc.

The board of supervisors, on May 1, 1893, two months subsequent to the passage of the act declaring Pebble Beach a place of public recreation, at a regular meeting, took the following proceeding with reference to Pebble Beach road. The order reads as follows:

"Supervisor Adair offered the following, and moved its adoption, seconded by Lawrence: 'Whereas, there has been in actual public use, for the period of forty years, in the county of San Mateo, state of California, a public road, in the Fifth township, Fifth road district, and Fifth supervisor district of said county, said road leading from the public road passing through the village of Pescadero towards Santa Cruz, to what is known as and called "Pebble Beach," in said county of San Mateo; and whereas no public record of said road has been made, as is now required by law: It is therefore ordered, that said roadway be recorded as a public highway of said county, in the proper road book kept by the county clerk of said county, and as required by law.'"

Whether or not this was ever done, does not, as stated, appear. At any rate, the county road book was not offered in evidence, and, presumably, it was never entered as such. The second official action taken by the board was on November 13, 1894, which is as follows:

"Supervisor Adair asked that the board instruct the county surveyor to survey the county road leading from Pescadero to Pebble Beach, in the Fifth township, and thereupon Mr. Bromfield is hereby instructed to survey said road, and report to this board."

In pursuance of this authority, a survey was made. Mr. Adair was the supervisor residing in Pescadero. That he took a very prominent part, and was one of the leading spirits, in seeking to

have Pebble Beach road declared a public highway, and in compelling complainant to keep it open to the public, is apparent from the testimony. He was at the head of the 20 or more people when the gate was cut down, and he himself admits taking a personal part in the repeated demolitions of the gate and adjoining fence. He seems to have supervised the whole affair. He threatened the complainant with personal injury if the latter interfered, and told him, according to complainant's testimony, that he was acting on his authority as supervisor. It is significant that he makes the following admissions on direct examination: "I think I told Mr. Coburn that I would keep that gate open as long as I was supervisor, and then I would go as a citizen." "I think, when I came there, that I told Mr. Coburn, when he forbid me of going through the fence, that I was going to do it, and had come for the purpose." The preponderance of the evidence indicates to my mind that he considered that he was acting in his official, as well as private, capacity, and that those who accompanied and assisted him on the various occasions, when the gate and fence were torn down, and other acts of trespass committed, so considered. The official known as the road master was generally present, and at least on one occasion a constable of the county was also present, but did not interfere. Supervisor Adair had also previously attended, as road commissioner, to repairs which he claims were made on the road, and testifies to several amounts for such services which he, as supervisor and road commissioner, approved, and which were subsequently ordered paid by the board. It may be true that he considered, and so did the entire board, and the people in and around Pescadero generally, that this was, or at least should be, a public road, and that he and they considered that they had a perfect legal right to maintain the road open to the public even to the extent of forced and armed interference; but, whatever their ideas, or the sincerity and honesty of their motives, they were mistaken, and the complainant thereby suffered and was injured and damaged in his property rights. The general rule as to the liability of a municipal corporation for torts is thus stated in 15 Am. & Eng. Enc. Law, p. 1141:

"So far as municipal corporations of any class, and however incorporated, exercise powers conferred on them for purposes essentially public,—purposes pertaining to the administration of general laws made to enforce the general policy of the state,—they should be deemed agencies of the state, and not subject to be sued for any act or omission occurring while in the exercise of such power, unless by statute the action be given; in reference to such matters they should stand, as does sovereignty, whose agents they are, subject to be sued only when the state by statute declares they may be. In so far, however, as they exercise powers not of this character, voluntarily assumed,—powers intended for the private advantage and benefit of the locality and its inhabitants,—there seems to be no sufficient reason why they should be relieved from that liability to suit and measure of actual damage to which an individual or private corporation exercising the same powers for purposes essentially private would be liable." See cases there cited.

In Thayer v. Boston, 19 Pick. 511, Mr. Chief Justice Shaw thus stated the law applicable to the proposition of the liability of municipal corporations for torts:

"The argument strongly pressed by the defendant is that, if the officers of the corporation, within their respective spheres, act lawfully and within the scope of their authority, their acts must be deemed justifiable, and nobody is liable for damages, and, if any individual sustains loss by the exercise of such lawful authority, it is damnum absque injuria. But if they do not act within the scope of their authority, they act in a manner which the corporation have not authorized, and in that case the officers are personally responsible for such unlawful and unauthorized acts. But the court are of opinion that this argument, if pressed to all its consequences, and made the foundation of an inflexible practical rule, would often lead to very unjust results. There is a large class of cases in which the rights of both the public and of individuals may be deeply involved, in which it cannot be known at the time the act is done whether it is lawful or not. The event of a legal inquiry in a court of justice may show that it was unlawful. Still, if it was not known and understood to be unlawful at the time, if it was an act done by the officers having competent authority, either by express vote of the city government, or by the nature of the duties and functions with which they are charged, by their offices, to act upon the general subject-matter, and especially if the act was done with an honest view to obtain for the public some lawful benefit or· advantage, reason and justice obviously require that the city, in its corporate capacity, should be liable to make good the damage sustained by an individual, in consequence of the acts thus done. It would be equally injurious to the individual sustaining damage, and to the agents and persons employed by the city government, to leave the party injured no means of redress except against agents employed, and by what at the time appeared to be competent authority, to do the acts complained of, but which are proved to be unauthorized by law. And it may be added that it would be injurious to the city itself, in its corporate capacity, by paralyzing the energies of those charged with the duty of taking care of its most important rights, inasmuch as all agents, officers, and subordinate persons might well refuse to act under the directions of its government in all cases where the act should be merely complained of and resisted by any individual as unlawful, on whatever weak pretense; and, conformably to the principle relied on, no obligation of indemnity could avail them. The court are therefore of opinion that the city of Boston may be liable in an action on the case, where acts are done by its authority which would warrant a like action against an individual, provided such act is done by the authority and order of the city government, or of those branches of the city government invested with jurisdiction to act for the corporation upon the subject to which the particular act relates, or where, after the act has been done, it has been ratified by the corporation, by any similar act of its officers. That an action sounding in tort will lie against a corporation, though formerly doubted, seems now too well settled to be questioned. Yarborough v. Bank, 16 East, 6; Smith v. Gaslight Co., 1 Adol. & E. 526. And there seems no sufficient ground for a distinction, in this respect, between cities and towns and other corporations. Clark v. Washington, 12 Wheat. 40; Baker v. Boston, 12 Pick. 184."

In the case cited the officers of the city of Boston having charge over its streets and public lands had taken up the pavement on a passageway in front of plaintiffs' warehouse, dug up the soil thereof, erected stalls, benches, etc., on the way, and obstructed communication, etc. There was a verdict in favor of plaintiff. The supreme court held that, as a matter of law, the city of Boston would be responsible, but set aside the verdict, and granted a new trial upon the ground that no evidence had been submitted to the jury as to whether the particular act, operating injuriously to the individual, had been authorized by the city, by any previous delegation of power, general or special, or by any subsequent adoption and ratification of particular acts. In Nevins v. Peoria, 41 Ill. 502, an action against the city of Peoria for so negligently changing the

grade of certain streets as to impair the value of plaintiff's adjoining property and business, it was said:

"The same law that protects my right of property against invasion by private individuals must protect it from similar aggression on the part of municipal corporations. A city may elevate or depress its streets, as it thinks proper; but if in so doing it turns a stream of mud and water upon the grounds and into the cellars of one of its citizens, or creates in his neighborhood a stagnant pond that brings disease upon his household, upon what ground of reason can it be insisted that the city should be excused from paying for the injuries it has directly wrought?"

The verdict and judgment in favor of the defendant in the lower court was reversed  In Ashley v. City of Port Huron, 35 Mich. 296, Judge Cooley considers at some length the liability of municipal corporations for torts, and, after discussing many authorities on the proposition, says:

"It is very manifest from this reference to authorities that they recognize in municipal corporations no exemption from responsibility where the injury an individual has received is a direct injury, accomplished by a corporate act which is in the nature of a trespass upon him. The right of an individual to the occupation and enjoyment of his premises is exclusive, and the public authorities have no more liberty to trespass upon it than has a private individual. If the corporation send people with picks and spades to cut a street through it, without first acquiring the right of way, it is liable for a tort. * * * A municipal charter never gives, and never could give, authority to appropriate the freehold of a citizen without compensation, whether it be done through an actual taking of it for streets or buildings or by flooding it so as to interfere with the owner's possession. His property right is appropriated in the one case as much as in the other,"—citing cases.

In the case just quoted from it appeared that the city of Port Huron had constructed a sewer in such a manner as to throw large quantities of water upon plaintiff's premises, which otherwise would not have flowed there, and it was held that the city was liable.   The law will also be found very clearly stated in Inman v. Tripp, 11 R. I. 520.   With reference to the responsibility of the municipal corporation for the acts of its officers, the court said:

"The defendant contends that the city is not liable for the acts complained of, or some of them, because they were done by the highway commissioners. We think, however, that the changes complained of, prima facie at least, must be regarded as the act of the city, which is answerable for the repair of the streets, and which, moreover, unlike towns, in respect of surveyors, is specially authorized to prescribe the duties of the highway commissioners. See City Charter, § 9, cl. 4; Pub. Laws, c. 965; Act Jan. 26, 1872. The city has prescribed their duties by ordinance, specifying certain duties, and requiring them to perform generally the duties of a surveyor of highways, with a proviso, however, that they shall be 'always subject to the orders of the city council.' City Ordinances, c. 36, § 17. Their official acts, therefore, however it might be in the case of a surveyor of highways, must be presumed to be, in legal effect, the acts of the city. And see Conrad v. Trustees, 16 N. Y. 158; Eastman v. Meredith, 36 N. H. 284, 293."

The rule laid down in that case is directly applicable to the case at bar.   The supervisor was also, by virtue of his office, ex officio road commissioner.   As such, he was under the affirmative duty, "under the direction and supervision and pursuant to orders of the board of supervisors," to take charge of the highways within their respective districts, and to employ all men, teams, etc., necessary to do work on the roads; also to keep the roads clear from obstruc-

tions, and in good repair, etc. Pol. Code Cal. § 2645, as amended in 1893, supra. For the proper discharge of this duty as road commissioner he was directly responsible to the board of supervisors. But it is claimed by respondent that Supervisor Adair was never authorized by the board to commit the acts proved against him, or to pursue the course he did. It is true that the board did not pass an order or authorization directing, in so many words, Supervisor Adair to tear down complainant's gate and his fence, and keep the road free from obstructions, nor did they adopt a resolution indorsing Adair's actions, nor did they officially ratify his course. But on the 1st of May, 1893, two months subsequent to the passage of the act declaring Pebble Beach a place of recreation for the public, they passed an order declaring Pebble Beach road a public road, and directed the county clerk to so enter it of record in accordance with the law. It is difficult to see what stronger and further authorization for his efforts to keep the road free from obstructions and open to the public Supervisor Adair required. The almost unanimous action of the board in this respect (only one voting against it) was sufficient authority, and impliedly empowered the supervisor of the district, where this pretended public road lay, to exercise all the powers and duties conferred upon him as such supervisor and as ex officio road commissioner. Moreover, the board tacitly recognized his actions, and impliedly approved them, by making no remonstrance of any sort to the course he was pursuing. It is evident from the testimony that Supervisor Adair had their good will and approbation, or else, in all probability, he never would have repeated his efforts in tearing down the gate and keeping the road open. The board, had they not recognized his course in this respect as lawful, and within the legitimate bounds of his authority, could have exonerated themselves very easily by disclaiming any connection with or responsibility for the course pursued by their fellow member.

"I am of the opinion, both upon the law and the facts of this case, that the county of San Mateo is liable for the tortious acts of its officer and agent, Supervisor and ex officio Road Commissioner Adair, and that the complainant should be indemnified for whatever damage he may have suffered in this connection." Judgment will be entered in favor of the complainant in accordance with the views expressed in this opinion. An injunction will be granted enjoining and restraining the respondent from trespassing on complainant's premises; and a reference of the case had to the master of this court to take and state, and to report to the court, the damages complainant has sustained.